### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

```
------------------------------ x
KNIGHTS OF COLUMBUS COUNCIL 2616 :
and JOSEPH P. SARGENT,            :
                                  :
         Plaintiffs,              :
                                  :
v.                                :  Civil No. 3:22-cv-1579 (AWT)
                                  :
TOWN OF FAIRFIELD, ANTHONY R.     :
CALABRESE, and BRIAN NERREAU,     :
                                  :
         Defendants.              :
------------------------------ x
```

### <u>RULING ON MOTION TO DISMISS</u>

Plaintiffs Knights of Columbus Council 2616 and Joseph P. Sargent have sued defendants Town of Fairfield, Anthony R. Calabrese (in his official capacity only), and Brian Nerreau (in his official capacity only) and filed a Complaint for Injunctive Relief, Declaratory Judgment, Damages, and Other Relief (ECF No. 1) (the "Complaint") that contains six causes of action. The Complaint sets forth, pursuant to 42 U.S.C. § 1983, claims for violation of the plaintiffs' First Amendment rights to freedom of speech, to the free exercise of religion, and to peaceably assemble, and the plaintiffs' Fourteenth Amendment right to equal protection; a claim for violation of their rights under the Constitution of the State of Connecticut; and a claim for violation of their rights under the Connecticut Freedom of Religion Act, Conn. Gen. Stat. § 52-571b.

The defendants move to dismiss the Complaint pursuant to

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons set forth below, the defendants' motion is being granted in part and denied in part.

## I. FACTUAL ALLEGATIONS AND BACKGROUND

The Complaint, "which [the court] must accept as true for purposes of testing its sufficiency," alleges the following circumstances. Monsky v. Moraghan, 127 F.3d 243, 244 (2d Cir. 1997).

Plaintiff Knights of Columbus Council 2616 (the "Knights 2616"), is a local council of a national Catholic fraternal service organization, the Knights of Columbus. The Knights 2616 are located in Fairfield, Connecticut. Plaintiff Joseph Sargent is a member of the Knights 2616 and a resident of Fairfield.

Since 1983, the Knights 2616 have conducted an annual Christmas Vigil accompanied by a Nativity scene at one of the Town of Fairfield's public parks. The purpose of the Christmas Vigil "is to advance the Keeping Christ in Christmas program," Compl. (ECF No. 1) ¶ 84, which is an annual program led by the National organization of the Knights of Columbus to "encourage[] local councils and members to prompt their neighbors to shift from a preoccupation with materialism to the light of Christ and the spirit of giving through whatever efforts best suit the parish and community of the particular council," id. ¶ 14.  The plaintiffs allege that the "Christmas Vigil is at its core the

exercise of religious belief," id. ¶ 21, and it "is one of the first forms of Christian worship where, after an angel came to announce the birth of the Savior, the shepherds keeping watch over their flock traveled to keep watch at the actual scene of Christ's birth," id. ¶ 18.

The Christmas Vigil begins on December 23rd and ends on Christmas morning, December 25th. During the Christmas Vigil, "one or more members of the Knights is present with the Nativity scene at all times." Id. ¶ 24. The Nativity scene is composed of a "3-sided box, with small figurines of the Holy Family, angels, the magi (three kings), shepherds and livestock." Id. "In addition to the Nativity scene, the Knights post a 4' x 8' sign with 6- inch letters stating that the Nativity scene is not endorsed by the Town of Fairfield and is sponsored by the Knights of Columbus." Id. ¶ 25.

By operation of the Town Charter and its Code, Fairfield's public parks are under the exclusive authority and control of the Parks and Recreation Commission (the "Commission"). The Commission has promulgated its own regulations (the "Regulations") concerning the use of public parks, which are administered through the Fairfield Parks and Recreation Department (the "Department"). At all relevant times, defendant Brian Nerreau served as the Chairman of the Commission and defendant Anthony Calabrese served as Director of the

Department.

Section 11-(a) of the Regulations provides:

> No person, or persons, or organization shall construct
> tents, stands, benches, shelters, or other structures
> of a temporary or permanent nature; camp overnight;
> nor hold any sponsored gathering or function on any
> Town park, beach, marina or open space without the
> express permission of the Parks & Recreation
> Commission, Conservation Commission, or their
> designee, as appropriate.

Pls.' Ex. A (ECF No. 1-1) at 7.[1] Section 37 of the Regulations

provides that "Park Properties will be made available according

to the regulations and usage fees listed" for specified "Special

Events" and "Special Athletic Events." Id. at 15. These Special

Events are Fairs, Festivals, Programs, Specialty Shows. The

Commission publishes procedures (the "Special Event Procedures")

on the Parks and Recreation webpage for an applicant to follow

to obtain permission to hold a "Special Event" in a public park.

The Special Event Procedures provide that:

> All Special Event requests need to be reviewed and
> approved by the Parks & Recreation Commission. In
> order to present your request to the Parks &
> Recreation Commission, a detailed Event Scope
> (inclusive of who, what, where, why, when & how) needs
> to be submitted to [Staff], Parks & Recreation Office
> Manager, through mail, fax (203.256.3145) or email.

Compl. ¶ 36 (alteration in original) (emphasis omitted).

---

[1] The page numbers cited to in this ruling for documents that have been
electronically filed refer to the page numbers in the header of the documents
and not to the page numbers in the original documents, if any.

Together, Sections 11-(a) and 37 of the Regulations and the Special Event Procedures constitute the permitting scheme for Special Events in Fairfield public parks (the "Special Events Permitting Scheme").

### A. The Plaintiffs' 2020 Special Event Permit Application

Each year, the plaintiffs submit a Special Events Permit application to the Department for a permit to host the Christmas Vigil in a Fairfield public park. Prior to 2020, and since its inception in 1983, the plaintiffs requested and "were immediately approved" to host the Christmas Vigil at the Town Hall Green "by the Director and/or Staff of the . . . Department without requiring the Knights 2616 to appear before the . . . Commission." Id. ¶ 27. In 2020, however, the plaintiffs applied for the first time to hold the Vigil at a different Fairfield public park, Sherman Green.

The plaintiffs sought the change in location because "holding the Christmas Vigil [at Sherman Green] would give it more visibility in the community, allowing the Knights [] to share their message to Keep Christ in Christmas more widely." Id. ¶ 58. In contrast to Town Hall Green, which is located on "a two-lan[e] road in a quiet residential neighborhood with no traffic lights," id. ¶ 57, Sherman Green is "located in the center of Fairfield," id. ¶ 58, "surrounded by restaurants and retail establishments[,] . . . contains a large gazebo and is

open to the sidewalks, street and to free public access," id. ¶ 48. "It is on the Post Road, Route 1, which has four lanes of traffic regulated by traffic lights." Id.

Around December 9, 2020, three weeks after the plaintiffs applied for a Special Event Permit, Department staff informed Sargent that Calabrese had denied the plaintiffs' application with respect to Sherman Green, citing COVID-19 concerns. The plaintiffs "were told they were allowed to continue to conduct the Christmas Vigil at the Town Hall Green" instead. Id. ¶ 61.

Perceiving the concerns about COVID-19 to be insincere, Sargent emailed Department staff shortly thereafter seeking confirmation that "Fairfield Parks and Rec is not allowing any permits or events for the use of Sherman Green during the holiday season due to health concerns" and that the COVID-19 related restrictions did not apply to just the Christmas Vigil. Id. ¶ 63. Department staff responded to Sargent's email affirmatively, stating: "Yes, that is, in fact, the direction that I was given from the Emergency Planning Team [("EPT")]." Id. ¶ 64.

On December 13, 2020, Sargent observed a large group gathering at Sherman Green to light a menorah. The Fire Department Chief, Denis McCarthy, was at the event and was introduced to Sargent as the head of the EPT. At the event, Sargent showed Chief McCarthy the email from Department staff

stating that the EPT had directed that all events at Sherman Green be halted due to COVID-19 related health concerns. Chief McCarthy denied that the EPT had given this direction and explained that the EPT would not have done so "because, like the menorah lighting, the Christmas Vigil was an 'outdoor religious gathering' and therefore exempt from the Governor's executive orders" regulating COVID-19. Id. ¶ 69. Chief McCarthy also stated that, "had he been asked, he would not have advised the Commission to deny the Knights 2616 use of . . . Sherman Green for the Christmas Vigil because it was a religious gathering." Id. ¶ 71 (emphasis omitted).

The following day, Sargent spoke with Department staff by phone, informing them of his conversation with Chief McCarthy. In response, Department staff told Sargent that, "at the direction of Calabrese, the Knights 2616 could submit its application to the Commission for review, but he (Calabrese) was confident that the application would be denied by the EPT." Id. ¶ 73. After the call, "Mr. Sargent immediately emailed the Department Staff and Calabrese . . . to confirm the accuracy of his recollection of the phone conversation." Id. ¶ 74. In his response,

> Calabrese did not contest Chief McCarthy's statement . . . but wrote: "[I]t would be my recommendation to the Parks and Recreation Commission not to approve your location change. That will still be my stance, I am not comfortable with putting this display on the

> Sherman Green given the backlash from residents about
> the Tree of Hope."

Id. ¶ 76 (alteration in original). Sargent proceeded to request that the Commission review the plaintiffs' application and a hearing was scheduled before the Commission for December 16, 2020.

The day of the hearing, Calabrese emailed Nerreau, at least one other Commissioner, and the Town Attorney concerning the plaintiffs' requested change of location, stating:

> The request [for the Christmas Vigil] is now to move
> to the Sherman Green. As you see my stance, I am not
> in favor of this move as I feel it stirs the pot. We
> have had many adamantly opposed to anything religious
> on the Sherman Green in recent months (even earlier
> today) I feel we should leave this display on the Town
> Hall Green as it has been there for 30 years without
> incident or complaint.

Id. ¶ 80 (alteration in original)(emphasis omitted).

At the hearing, Sargent made a short presentation explaining that the purpose of the Vigil is to "advance the Keeping Christ in Christmas program . . . and the reason for the move from the Town Hall Green to Sherman Green was an increase in visibility . . . ." Id. ¶ 80. Calabrese shared his opposition to the plaintiffs' application, recommending that the Commission deny the application due to his concerns about community reaction. See Id. ¶ 85 ("I don't believe that the Sherman Green is the right place . . . we can look at the past year at the things that have happened on the [Sherman] (sic) Green with the

-8-

Tree of Hope, with patriotic displays, and just how the community has reacted. . . ." (emphasis omitted)). Nerreau stated that he would not be supporting the plaintiffs request because, while "there are a few ceremonies that are taking place, that have taken place [at Sherman Green], . . . these are ceremonies that take place and then, everything is removed. I view the crèche more as a display that would be presented there more than a ceremony." Id. ¶ 92; see also id. ¶ 91 ("Chairman Nerreau acknowledged that 'that there was a ceremonial menorah lighting on the first eve of Hanukah on December 8th and one planned for the final night.' See Minutes at 34:55."). At least one other Commissioner also spoke during the hearing and "was more explicit [than Nerreau], effectively raising an issue as to whether the Christmas Vigil was religious in nature." Id. ¶ 99.

Following this discussion, a Commissioner moved to approve the plaintiffs' application. The motion was not seconded, and Nerreau advised Sargent that the Commission would not be approving the move to Sherman Green. As a result of the application being denied, the plaintiffs held the Christmas Vigil in 2020 on Town Hall Green.

**B. The Plaintiffs' 2021 Special Event Permit Application**

On August 31, 2021, the plaintiffs applied for permission to hold the 2021 Christmas Vigil on Sherman Green. By this time "[COVID-19] restrictions on outdoor gatherings had been lifted .

-9-

. . [and] Sherman Green was regularly being used for all sorts of events including outdoor concerts." Id. ¶ 107.

Despite being timely filed, the plaintiffs' application did not appear on the agenda for the Commission's September meeting. In response to Sargent's inquiry about the absence of the application from the agenda, Department staff forwarded the following message from Nerreau:

> Regarding the Knights of Columbus request, nothing has changed. A primary difference between their request and other approved events is that their request is for a display and the other requests being considered and approved recently are for ceremonies. As nothing has changed . . . they can continue to use the town hall location without seeking new approval but that we will not hear the request for the Sherman Green again.

Id. ¶ 106 (emphasis and internal quotation marks omitted). On September 22, 2021, Sargent wrote to the Commission "explaining that its actions continued to violate the constitutional rights of the Plaintiffs, and explaining the irrationality of the 'ceremony' and 'display' distinction." Id. ¶ 110. The plaintiffs' application was then placed on the agenda for the Commission's October 22, 2021 meeting.

At the October meeting, "Nerreau appear[ed] to have abandoned his 'display' vs. 'ceremony' . . . justification," id. ¶ 115, stating instead "that he did not support the Christmas Vigil because it [lasted] too many hours" and took place overnight, id. ¶ 116. See also ¶ 115 (Nerreau stated that "there

were 162 events since 2019, and of those events, 157 were either in the afternoon or concluded by 8 p.m. . . . [T]here were never any past 9 p.m. . . . [and] only four of them went longer than four hours."). Nerreau further stated, "we support what you are doing; we just support it at the location you were using since 1989 [the Town Hall Green.]'" Id. ¶ 118 (alterations in original). "Mr. Sargent [then] inquired whether the Knights 2616 could be permitted instead to leave the Nativity, unattended, on Sherman Green on Christmas Eve . . . just as other groups with the Tree of Hope had been allowed to leave their signs displayed overnight and unmanned . . . ." Id. ¶ 120. "Nerreau told him 'no.'" Id. ¶ 121. When "Mr. Sargent then asked for an explanation as to why the Commission permits other groups to leave signs . . . overnight on Sherman Green . . . but would require Plaintiffs to remove the Nativity and shut down the vigil at 8 p.m. on Christmas Eve," no explanation was offered by any Commissioner. Id. ¶ 122.

Following the discussion, the Commission voted on the plaintiffs' application, and it was denied with respect to Sherman Green by a vote of 4-4. The Commission did, however, approve the plaintiffs' application to hold the Christmas Vigil at Town Hall Green, which was also for overnight use and the same extended period of time.

The plaintiffs allege that "Nerreau's justification with

-11-

respect to the hours of use was a pretext as the Regulations do not contain any time limitations on the use of public parks, nor is there any prohibition with respect to overnight use." Id. ¶ 125. The plaintiffs further allege that "[a] review of the public minutes from the Commission's meetings indicates that in the five years prior to the Knights 2616's Christmas Vigil applications, the Commission did not deny a single application to use Sherman Green other than the Knights' Christmas Vigil application." Id. ¶ 136.

**C. The 2022 Special Event Permit Application**

After the plaintiffs brought this action, they submitted an application to hold their 2022 Christmas Vigil on the Sherman Green. See Final Minutes for December 21, 2022 Meeting (the "12/21/22 Commission Meeting Minutes"), Town of Fairfield Parks and Recreation Commission, https://cms3.revize.com/revize/fairfield/Document%20Center/Agendas%20&%20Minutes/Parks%20and%20Recreation%20Commission/2022/Minutes/Minutes_12-21-2022_Final.pdf, at 2.[2] The application was heard at the

---

[2] The defendants request that the court "take judicial notice of the minutes for the December 21, 2022 meeting of the Town of Fairfield Parks and Recreation Commission." Defs.' Mem. (ECF No. 19-1) at 3 n.1. A court "may properly take judicial notice of [a] document" on a motion to dismiss when the document is "publicly available and its accuracy cannot reasonably be questioned." Apotex Inc. v. Acorda Therapeutics, Inc., 823 F.3d 51, 60 (2d Cir. 2016). Courts in this Circuit have found minutes from municipal entity meetings to be matters of public record, fit for judicial notice. See, e.g., King v. City of New York, 581 F.Supp.3d 559 (S.D.N.Y. 2022); Novie v. Vill. of Montebello, 2012 WL 3542222, at *10 (S.D.N.Y. Aug. 16, 2012); Belyea v. City of Glen Cove, 2022 WL 3586559, at *6 (E.D.N.Y. Aug. 22, 2022).

Commission's December 21, 2022 meeting. <u>See</u> <u>id.</u> Following discussion, the move to Sherman Green was approved by a vote of 7-1, with one abstention. <u>See</u> <u>id.</u> at 3.

## II. LEGAL STANDARD

"A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate it[.]'" <u>Cortlandt St. Recovery Corp. v. Hellas Telecomm.</u>, 790 F.3d 411, 416-17 (2d. Cir. 2015) (quoting <u>Makarova v. United States</u>, 201 F.3d 110, 113 (2d Cir. 2000)). The party asserting subject matter jurisdiction "bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." <u>Aurechione v. Schoolman Transp. Sys., Inc.</u>, 426 F.3d 635, 638 (2d Cir. 2005).

When reviewing a motion to dismiss for lack of subject matter jurisdiction, the court may consider evidence outside the pleadings. <u>See</u> <u>Makarova</u>, 201 F.3d at 113. "The court may resolve the disputed jurisdictional fact issues by referring to evidence

---

Accordingly, the court takes judicial notice of the 12/21/22 Commission Meeting Minutes for the limited purposes of determining the actions taken by the relevant parties, not for the truth of any statements made during the meeting. <u>See</u> <u>Lewis v. M&T Bank</u>, 2022 WL 775758, at *1 (2d Cir. Mar. 15, 2022) ("[C]ourts may take judicial notice of publicly available documents," but, as a general matter, they "must do so 'to determine what statements [the documents] contained . . . [and] not for the truth of the matters asserted' in the documents." (alterations and ellipsis in original) (quoting <u>Roth v. Jennings</u>, 489 F.3d 499, 509 (2d Cir. 2007)).

outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing." Fountain v. Karim, 838 F.3d 129, 134 (2d Cir. 2016) (quoting Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000)). If genuine issues of material fact exist, a district court should not prematurely dismiss a case for lack of subject matter jurisdiction. See Haskin v. United States, 569 F. App'x 12, 15 (2d Cir. 2014) ("We conclude that the district court prematurely dismissed the [plaintiff's] suit for lack of subject matter jurisdiction, as genuine issues of material fact existed concerning the alleged negligence of [the government's] employees.").

When deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual

allegation"). "Nor does a complaint suffice if it tenders naked
assertions devoid of further factual enhancement." Ashcroft v.
Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at
557). "Factual allegations must be enough to raise a right to
relief above the speculative level, on the assumption that all
the allegations in the complaint are true (even if doubtful in
fact)." Twombly, 550 U.S. at 555 (internal citations and
quotations omitted). However, the plaintiff must plead "only
enough facts to state a claim to relief that is plausible on its
face." Id. at 547. "A claim has facial plausibility when the
[claimant] pleads factual content that allows the court to draw
the reasonable inference that the defendant is liable for the
misconduct alleged." Iqbal, 556 U.S. at 678. "The function of a
motion to dismiss is 'merely to assess the legal feasibility of
the complaint, not to assay the weight of the evidence which
might be offered in support thereof.'" Mytych v. May Dep't
Store Co., 34 F. Supp. 2d 130, 131 (D. Conn. 1999) (quoting
Ryder Energy Distribution v. Merrill Lynch Commodities, Inc.,
748 F.2d 774, 779 (2d Cir. 1984)). "The issue on a motion to
dismiss is not whether the plaintiff will prevail, but whether
the plaintiff is entitled to offer evidence to support his
claims." United States v. Yale New Haven Hosp., 727 F. Supp.
784, 786 (D. Conn. 1990) (citing Scheuer, 416 U.S. at 232).

    In its review of a motion to dismiss for failure to state a

claim, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." Samuels v. Air Transport Local 504, 992 F.2d 12, 15 (2d Cir. 1993). "[I]n some cases, a document not expressly incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss. A document is integral to the complaint 'where the complaint relies heavily upon its terms and effect.'" Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)).

## III. DISCUSSION

The defendants contend that the plaintiffs' claims for injunctive and declaratory relief are moot as a result of the approval of the plaintiffs' 2022 application, and that the denial of the plaintiffs' 2020 application was a valid exercise of discretion to mitigate a public health emergency, which warrants dismissal of the plaintiffs' claims to the extent they are based on the 2020 application. The defendants also contend that all of the claims in the Complaint should be dismissed for failure to state a claim upon which relief can be granted. Finally, the defendants contend that the claims against the individual defendants, which are brought against them in their

official capacities only, should be dismissed as duplicative of the claims against the Town of Fairfield.

### A. Injunctive and Declaratory Relief

The defendants contend that because the Commission approved the plaintiffs' 2022 application to hold the Christmas Vigil at Sherman Green, the plaintiffs' claims for injunctive and declaratory relief have been rendered moot and should be dismissed.

"Article III of the Constitution grants the Judicial Branch authority to adjudicate 'Cases' and 'Controversies.'" Already, LLC v. Nike, Inc., 568 U.S. 85, 90 (2013). "A case becomes moot -- and therefore no longer a Case or Controversy for purposes of Article III -- when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." Id. at 91 (internal quotation marks omitted).

However, a defendant's "voluntary cessation of allegedly illegal conduct" is generally not enough to render a case moot. United States v. W. T. Grant Co., 345 U.S. 629, 632 (1953). "Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." Already, 568 U.S. at 91. "Accordingly, courts will find a case moot after a defendant voluntarily discontinues challenged conduct only if '(1) it can

-17-

be said with assurance that 'there is no reasonable expectation'
that the alleged violation will recur' and '(2) interim relief
or events have completely and irrevocably eradicated the effects
of the alleged violation.'" Am. Freedom Def. Initiative v.
Metro. Transp. Auth., 815 F.3d 105, 109 (2d Cir. 2016) (quoting
Los Angeles Cnty. v. Davis, 440 U.S. 625, 631 (1979) (internal
citations and alteration omitted)). "This is both a stringent
and a formidable burden." Mhany Mgmt., Inc. v. Cnty. of Nassau,
819 F.3d 581, 604 (2d Cir. 2016) (internal citations omitted).

    Here, the defendants have failed to meet their "formidable
burden of showing that it is absolutely clear the allegedly
wrongful behavior could not reasonably be expected to recur."
Id. at 603-604 (emphasis in original) (quoting Friends of the
Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167,
189 (2000)). The plaintiffs claim that the Commission denied
their applications for constitutionally impermissible reasons,
enabled by a permitting scheme that grants the Commission
"unbridled discretion in considering applications for Special
Event permits." Compl. ¶ 145. The defendants have not shown that
the Commission has been divested of such discretion. The only
identifiable change in circumstances is that, in 2022 unlike in
2020 and 2021, a majority of the Commissioners voted in favor of
the plaintiffs' application. This is insufficient to assure that
the alleged practice of denying the plaintiffs' applications for

constitutionally impermissible reasons will not recur in the future.  See Knox v. SEIU, Local 1000, 567 U.S. 298, 307 (2012) ("[S]ince the [defendants] continue[] to defend the legality of [their actions], it is not clear why the[y] would necessarily refrain from [resuming these actions] in the future.").

Moreover, courts view voluntary cessation of challenged conduct with particular skepticism where it "appear[s] to track the development of th[e] litigation." Mhany Mgmt., 819 F.3d at 604; see also Knox, 567 U.S. at 307 (declining to find case moot where the defendant union had, after a petition for certiorari was filed, sent a notice offering a full refund to all union members, and observing that "[s]uch postcertiorari maneuvers designed to insulate a decision from review by this Court must be viewed with a critical eye"); Ahrens v. Bowen, 852 F.2d 49, 53 (2d Cir. 1988) ("The fact that the Secretary, who had repeatedly refused to waive recoupment in the present case over a five year period, suddenly elected to do so on the eve of plaintiffs' motion for summary judgment . . . suggests an attempt by the Secretary to conjure up an argument for mootness and thwart adjudication of the issue." (quoting Ahrens v. Bowen, 646 F. Supp. 1041, 1048 (E.D.N.Y. 1986)).

In Mhany Management, the court found that the "suspicious timing and circumstances" of the defendants' approval of a proposal to develop a relevant piece of property mitigated

against a finding of mootness. 819 F.3d at 604. Similar circumstances are present here. After denying the plaintiffs' applications for a Special Event Permit for two years, the Commission voted to approve the plaintiffs' application for the first time seven days after the plaintiffs filed suit. Of note, several of the Commissioner's referred to the lawsuit during the discussion that preceded the vote approving the plaintiffs' application. See 12/21/22 Commission Meeting Minutes at 2-3. Most notably, one of the Commissioners who voted in favor of approving the plaintiffs' 2022 application, after mentioning that his votes against the plaintiffs applications in 2020 and 2021 "were primarily based on the Parks and Recreation rules regarding temporary structures and camping overnight, . . . stated that 'It's upsetting that, because you didn't like the outcome, and it's clear to me that you're not following the rules, you brought a lawsuit into the mix to get your way.'" Id.

Therefore, the plaintiffs' claims for injunctive and declaratory relief are not moot, and the motion to dismiss on this ground is being denied.

### B. Denial of the Plaintiffs' 2020 Application

The defendants contend that "[t]o the extent that any of plaintiffs' claims allege violations regarding the 2020 application, those claims should be dismissed, as the denial was a valid discretionary action by the Town to mitigate [the COVID-

19] public health emergency." Defs.' Mem. (ECF No. 19-1) at 6.

Under Jacobson v. Commonwealth of Massachusetts, 197 U.S.
11 (1905), courts are required "to uphold governmental measures
to protect public health unless they bear 'no real or
substantial relation to' the object of public health or are
'beyond all question, a plain, palpable invasion of rights
secured by the fundamental law.'" Clementine Co., LLC v. Adams,
74 F.4th 77, 84 (2d Cir. 2023) (quoting Jacobson, 197 U.S. at
27). The defendants cite to several cases where constitutional
challenges to executive orders issued in response to the COVID-
19 pandemic were rejected. See Defs.' Mem. at 6-7 (citing Moxie
Owl, Inc. v. Cuomo, 527 F. Supp. 3d 196, 200 (W.D.N.Y. 2021);
Amato v. Elicker, 460 F. Supp. 3d 202, 219 (D. Conn. 2020);
Amato v. Elicker, 534 F. Supp. 3d 196 (D. Conn. 2021); and
Hopkins Hawley LLC v. Cuomo, 518 F. Supp. 3d 705 (S.D.N.Y.
2021)).

The cases cited by the defendants are not on point for two
reasons. One, the denial of the plaintiff's 2020 application was
an individualized assessment subject to the Commission's
discretion, not an executive order that had general
applicability. Two, the Regulations and the Special Event
Procedures, pursuant to which the defendants exercised their
discretion, were not "enacted to protect public health" within
the meaning of Jacobson, because they were promulgated prior to

the COVID-19 pandemic. <u>Jacobson</u>, 197 U.S. at 31; <u>see</u> Pls.' Ex. A
at 17 ("These rules and regulations were approved by the Parks &
Recreation Commission on November 20, 1989 . . . .").

Moreover, even if "<u>Jacobson</u>'s deferential standard of
judicial review" applied, <u>Hopkins Hawley</u>, 518 F. Supp. 3d at
712, "[a]s other judges have emphasized, <u>Jacobson</u> preserves the
authority of the judiciary to strike down laws that use public
health emergencies as a pretext for infringing individual
liberties," <u>Page v. Cuomo</u>, 478 F. Supp. 3d 355, 368 (N.D.N.Y.
2020) (quoting <u>Cassell v. Snyders</u>, 458 F. Supp. 3d 981, 993
(N.D. Ill. 2020)). <u>See also</u> <u>Bimber's Delwood, Inc. v. James</u>, 496
F. Supp. 3d 760, 773 (W.D.N.Y. 2020) (emphasizing that a court's
review of police power under <u>Jacobson</u> "encompasses 'asking
whether power has been exercised in an arbitrary, unreasonable
manner, or through arbitrary and oppressive regulations.'" (some
internal quotation marks omitted) (quoting <u>In re Abbott</u>, 954
F.3d 772, 784 (5th Cir. 2020))).

Taking the factual allegations in the Complaint as true,
the plaintiffs have shown that the defendants' stated reason for
denying their 2020 application, i.e. COVID-19 concerns, was
pretextual. The plaintiffs have alleged that although Department
staff told Sargent that the EPT directed the Department not to
grant any "permits or events for the use of Sherman Green during
the holiday season due to health concerns," Compl. ¶ 63, the

head of the EPT "denied that the EPT gave this direction to the Department," id. ¶ 69. The plaintiffs have also alleged that despite the purported public health concern, a different group was approved to host a "large group gathering" on Sherman Green, id. ¶ 65, that was held only four days after "Department Staff informed Mr. Sargent that Calabrese had denied the application to hold the Christmas Vigil on Sherman Green citing concerns about COVID-19," id. ¶ 60.

Finally, the plaintiffs allege that Calabrese made remarks which demonstrate that his position on the plaintiffs' application was due to a concern about the subject matter of the Christmas Vigil, not COVID-19. See id. ¶ 76 (statement in an email to Sargent that "it would be my recommendation to the . . . Commission not to approve your location change. . . . I am not comfortable with putting this display on the Sherman Green given the backlash from residents about the Tree of Hope") (emphasis and alteration omitted); id. ¶ 80 (statement in an email to the Town Attorney and several other Commissioner's that "I am not in favor of this move as I feel it stirs the pot. We have had many adamantly opposed to anything religious on the Sherman Green in recent months (even earlier today) . . . .") (emphasis omitted); id. at ¶ 85 (alterations in original) (comments made during the Commission's hearing on the plaintiffs' 2020 application that "we can look at the past year at the things that have happened

on the [Sherman] (sic) Green with the Tree of Hope, with patriotic displays, and just how the community has reacted, and I don't think that the Sherman Green is the correct location.") (emphasis omitted).

Therefore, the motion to dismiss the plaintiffs' claims to the extent they are based on the 2020 application, on the grounds that denial of the 2020 application was a valid discretionary action by the Town to mitigate a public health emergency, is being denied.

**C. First and Third Causes of Action**

To state a cause of action under 42 U.S.C. § 1983, a plaintiff must allege that: (1) the challenged conduct was "committed by a person acting under color of state law," and (2) the conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010) (quoting Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994)).

The First Cause of Action is a claim against the defendants for violation of the plaintiffs' First Amendment right to freedom of speech. The Third Cause of Action is a claim against the defendants for violation of the plaintiffs' First Amendment right to peaceably assemble. Under both Causes of Action, the plaintiffs' bring facial and as applied challenges.

The same conduct underlies both Causes of Action, i.e. the

denial of the plaintiffs' applications, and "the same analytical framework applies whether the First Amendment right being exercised is speech . . . or other 'expressive activity' such as assembly," Johnson v. Perry, 859 F.3d 156, 171 (2d Cir. 2017) (internal citation omitted), so the analysis for the First and Third Causes of Action is the same.

### 1. **Applicable Law**

"[R]estrictions [on expressive activity] imposed on government-owned property are analyzed under a 'forum-based' approach that divides government property into three categories -- the traditional public forum, the designated public forum, and the nonpublic forum." Byrne v. Rutledge, 623 F.3d 46, 53 (2d Cir. 2010) (citing Perez v. Hoblock, 368 F.3d 166, 172-73 (2d Cir. 2004) (collecting authorities)). "[T]he level of judicial scrutiny that must be applied to state actions inhibiting speech varies with the nature of the forum in which the speech occurs." Johnson, 859 F.3d at 171 (alteration in original) (quoting Peck v. Baldwinsville Cent. Sch. Dist., 426 F.3d 617, 625 (2d Cir. 2005)).

Sherman Green is a traditional public forum. See, e.g., Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983) (public parks are "quintessential public forums"); Hotel Employees & Restaurant Employees Union, Local 100 v. City of New York Department of Parks & Recreation, 311 F.3d 534, 544-

45 (2d Cir. 2002) ("The classic examples of traditional public fora are streets, sidewalks, and parks, which are properties that 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" (quoting Perry, 460 U.S. at 45)). In a traditional public forum, "[t]he government's authority to regulate speech or expressive conduct . . . is sharply circumscribed." Hobbs v. Cty. of Westchester, 397 F.3d 133, 148 (2d Cir. 2005). Similarly, a

> "prior restraint[]" on speech, i.e., any regulation that "give[s] public officials the power to deny use of a forum in advance of actual expression," such as a requirement that a permit be obtained in advance of the proposed speech or conduct, is "not unconstitutional per se," but it "bear[s] a heavy presumption against its constitutional validity."

Id. (alteration in original) (internal citations omitted).

If a regulation restricts expression on the basis of its content, a court will analyze its constitutionality under strict scrutiny review. See id. at 148-49. By contrast, if a regulation is content neutral, a court will apply intermediate scrutiny. See id. at 149. This framework governs both facial and as applied challenges. See, e.g., Nat'l Council of Arab Americans v. City of New York, 478 F. Supp. 2d 480, 490 (S.D.N.Y. 2007) ("The framework governing as applied challenges . . . is the same as that for facial challenges.") ;

Geller v. Hochul, 2021 U.S. Dist. LEXIS 183367, at *34 (S.D.N.Y. Sep. 24, 2021) (applying the same framework to analyze the plaintiff's facial and as applied challenges under the First Amendment).

### 2. **Facial Challenges**

The plaintiffs claim the Regulations and the Special Event Procedures that constitute the Special Events Permitting Scheme are facially unconstitutional because they "allow the Commission unbridled discretion in considering applications for Special Event permits . . . ." Compl. ¶ 145.  A facial challenge "considers only the text of the statute [or regulation] itself, not its application to the particular circumstances of an individual." Field Day, LLC v. Cty. of Suffolk, 463 F.3d 167, 174 (2d Cir. 2006). The text of Sections 11-(a) and 37 of the Regulations and the Special Event Procedures do not contain restrictions specific to the content of expression, so they are content neutral. To "comport with . . . First Amendment restrictions . . . content-neutral licensing and permitting schemes (1) must contain adequate standards to guide the official's decision, (2) must be narrowly tailored to serve a significant government interest, and (3) must leave open ample alternatives for communication." Am. Patriot Express v. City of Glens Falls, 474 F. Supp. 3d 508, 526 (N.D.N.Y. 2020) (citing Thomas v. Chi. Park Dist., 534 U.S. 316, 323, 323 n.3

-27-

(2002)). <u>See also</u> <u>Forsyth Cnty., Ga. v. Nationalist Movement</u>,
505 U.S. 123, 130 (1992) ("Such a scheme, however, must meet
certain constitutional requirements. It may not delegate overly
broad licensing discretion to a government official. . . . [and]
must not be based on the content of the message, must be
narrowly tailored to serve a significant governmental interest,
and must leave open ample alternatives for communication.").
"These requirements are conjunctive, and the failure to meet any
one of them violates the First Amendment. <u>See</u> <u>Kuba v. l-A Agr.</u>
<u>Ass'n</u>, 387 F.3d 850, 858 (9th Cir. 2004) ('The failure to
satisfy any single prong of this test invalidates the [law].')."
<u>Am. Patriot Express</u>, 474 F. Supp. 3d at 526-27 (alteration in
original). The plaintiffs have sufficiently alleged that the
Special Event Permitting Scheme is facially unconstitutional.

The defendants contends that "Section 11 is not a statute
vulnerable to a facial challenge" because "Section 11(a)
includes the construction of tents, benches, shelters, and other
structures, at locations including beaches or marinas. . . .
[and] Sections 11(b) and (c) describe restrictions on alcoholic
beverages, smoking and vaping." Defs.' Mem. at 8. Thus, the
defendants contend, "Section 11 is most reasonably construed as
a regulation on public health, safety, and coordination, far
from one that is 'directed narrowly and specifically at
expression'." <u>Id.</u>

However, the fact that it is not directed narrowly and specifically at expression does not negate the fact that Section 11-(a) is nonetheless broad enough to cover expressive activity such as protests, demonstrations, or religious ceremonies, as reflected in the language the defendants do not quote, i.e. "hold any sponsored gathering or function." Nor does the fact that Section 11-(a), or even Section 11 generally, contains restrictions on non-expressive activity, in addition to restrictions on expressive activity, mean that it is not required to satisfy the requirements of the First Amendment.

The Special Events Permitting Scheme does not satisfy the requirement that it contain adequate standards to guide the official's decision. It contains no criteria, restraints, temporal limits, or guidelines to which the Commission must adhere when ruling on an application. Nor does it contain a method to appeal the Commission's determination or require that the Commission furnish justifications for its decisions with respect to applications for Special Events Permits. Rather, the Special Events Permitting Scheme vests the Commission with unbridled discretion. See Forsyth Cty., 505 U.S. at 133 (ordinance vested a county administrator with unbridled discretion because there were "no articulated standards, . . . . [he] is not required to rely on any objective factors . . . . [or] provide any explanation for his decision, and that decision

is unreviewable"); cf. Thomas, 534 U.S. at 323-24 (ordinance did not vest the municipal agency responsible for approving permits for the use of public property with "unduly broad discretion" because it enumerated an exclusive list of "reasonably specific and objective" grounds on which the agency could deny a permit and therefore did "not leave the decision to the whim of the administrator").

Therefore, the motion to dismiss is being denied as to the facial challenges in the First and Third Causes of Action.

### 3. **As Applied Challenges**

The plaintiffs also claim the defendants' actions under the Special Events Permitting Scheme violated their rights to free speech and to peaceably assemble under the First Amendment. In contrast to a facial challenge, an as applied challenge "requires an analysis of the facts of a particular case to determine whether the application of a statute [or regulation] . . . deprived the individual to whom it was applied of a protected right." Field Day, 463 F.3d at 174.

Although the Regulations and the Special Event Procedures that constitute the Special Events Permitting Scheme are neutral on their face, the plaintiffs' contend that the defendants' actions under the Permitting Scheme were not. The plaintiffs claim that the defendants' "actions in denying the Plaintiffs' permission to hold the Christmas Vigil on the Sherman Green were

content-based because they distinguished favored speech from disfavored speech on the basis of the ideas or views expressed." Compl. ¶ 147. Viewing the factual allegations in the light most favorable to the plaintiffs, the plaintiffs have plausibly alleged that the defendants' actions were content-based. They have alleged facts showing that the Commission permitted other groups to use Sherman Green in a manner that was inconsistent with the reasons the Commission gave for denying the plaintiffs' applications. See, e.g., id. ¶¶ 60, 91 (another religious group was granted permission to host a large group gathering on Sherman Green around the same time the plaintiffs were denied permission to hold the Christmas Vigil on Sherman Green purportedly due to concerns related to COVID-19); id. ¶¶ 52, 115-16, 131 (other groups were granted permission to set up temporary ice rinks overnight for three days at a time, or allowed to leave signs unattended and overnight for extended periods of time on Sherman Green, while a Commissioner opposed the plaintiffs permit application because the Christmas Vigil was too many hours and took place overnight). Therefore, strict scrutiny applies.

The burden of demonstrating that a content-based restriction on expression satisfies strict scrutiny falls on the party -- in this case the defendants -- "seeking to uphold [the] restriction." Edenfield v. Fane, 507 U.S. 761, 770 (1993)

(quoting Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 71,
n. 20 (1983)); see also Cornelio v. Connecticut, 32 F.4th 160,
177 (2d Cir. 2022) ("Once it is apparent that heightened
scrutiny applies, the government cannot be excused from the
obligation to identify evidence that supports its restriction of
a constitutional right."). The defendants must show that the
restriction "serves a compelling governmental interest,
is necessary to serve the asserted [compelling] interest, is
precisely tailored to serve that interest, and is the least
restrictive means readily available for that purpose." Hobbs,
397 F.3d at 149 (alteration in original) (internal quotation
marks and citations omitted). The defendants have offered no
arguments as to why their actions under the Special Events
Permitting Scheme survive strict scrutiny, and thus have failed
to make such a showing.

Therefore, the motion to dismiss is being denied as to the
as applied challenges in the First and Third Causes of Action.

**D. Second Cause of Action**

The Second Cause of Action is a claim against the
defendants for violation of the plaintiffs' First Amendment
right to the free exercise of religion. Under this Cause of
Action, the plaintiffs bring facial and as applied challenges.

**1. Facial Challenge**

Although the Free Exercise Clause of the First Amendment,

applicable to the states through the Fourteenth Amendment, forbids the enactment of laws which "prohibit[] the free exercise" of religion," U.S. Const. amend. I, it "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability," Agudath Israel v. Cuomo, 983 F.3d 620, 631 (2d Cir. 2020) (quoting Emp. Div. v. Smith, 494 U.S. 872, 879 (1990) (internal quotation marks omitted)). "Under the Free Exercise Clause, which the Fourteenth Amendment incorporated as to the States, see Cantwell v. Connecticut, 310 U.S. 296, 304-05 . . . (1940), the government may sometimes burden the external practice of religion." We the Patriots United States v. Conn. Office of Early Childhood Dev., 76 F.4th 130, 144 (2d Cir. 2023). "In . . . Smith, 494 U.S. [at] 879 . . . , the Supreme Court reaffirmed that a law that incidentally burdens religious exercise is constitutional when it (1) is neutral and generally applicable and (2) satisfies rational basis review." Id. "If the law is not neutral or not generally applicable, it is subject to strict scrutiny, and the burden shifts to the government to establish that the law is narrowly tailored to advance a compelling government interest." Id. See also Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 526 (2022) ("Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny.").

A law is not neutral if "it explicitly singles out a

religious practice . . . [or] 'targets religious conduct for
distinctive treatment.'" We the Patriots USA, Inc. v. Hochul, 17
F.4th 266, 281 (2d Cir. 2021) (quoting Church of Lukumi Babalu
Aye v. City of Hialeah, 508 U.S. 520, 533-34 (1993)). A law is
not generally applicable "if it invites the government to
consider the particular reasons for a person's conduct by
providing a mechanism for individualized exemptions," or "if it
prohibits religious conduct while permitting secular conduct
that undermines the government's asserted interests in a similar
way." Id. at 284 (quoting Fulton v. City of Phila., 593 U.S.
522, 533-34 (2021) (internal quotation marks and alterations
omitted)).

As discussed above with respect to the First and Third
Causes of Action, the Special Events Permitting Scheme contains
no criteria, restraints, or guidelines to which the Commission
must adhere when ruling on an application. This lack of
standards creates a mechanism for individualized exemptions
where "secularly motivated conduct could be impermissibly
favored over religiously motivated conduct." We the Patriots
USA, Inc. v. Hochul, 17 F.4th at 289. See also Fulton, 593 U.S.
at 535 (a system of individual exemptions existed where the
official had "sole discretion" to approve or deny exemptions to
an anti-discrimination provision); cf. We the Patriots USA, Inc.
v. Hochul, 17 F.4th at 288-90 (a medical exemption contained in

a vaccine mandate did not create a mechanism for individualized exemptions because the medical exemption "provides for an objectively defined category of people to whom the vaccine requirement does not apply" and therefore "affords no meaningful discretion to the State or employers"). Thus, plaintiffs have plausibly alleged that the Special Events Permitting Scheme is not generally applicable.

Consequently, the burden shifts to the defendants to establish that the Special Events Permitting Scheme can withstand strict scrutiny. See, e.g., We the Patriots United States v. Conn. Office of Early Childhood Dev., 76 F.4th at 144 ("If the law is not neutral or not generally applicable, it is subject to strict scrutiny, and the burden shifts to the government to establish that the law is narrowly tailored to advance a compelling government interest."). The defendants have not made any such argument.

Therefore, the motion to dismiss is being denied as to the facial challenge in the Second Cause of Action.

### 2. As Applied Challenge

"Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." Fulton, 593 U.S. at 533. "In Church of Lukumi Babalu Aye . . . the [Supreme] Court made clear that the government, if it is to respect the Constitution's

-35-

guarantee of free exercise . . . cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n, 584 U.S. 617, 638 (2018). "The Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." Id. (quoting Church of Lukumi Babalu Aye, 508 U.S. at 534). "Here, that means the Commission was obliged under the Free Exercise Clause to proceed in a manner neutral toward and tolerant of [the plaintiffs'] religious beliefs." Id. "Factors relevant to the assessment of governmental neutrality include 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decision[-]making body.'" Id. at 639 (quoting Church of Lukumi Babalu Aye, 508 U.S. at 540).

The plaintiffs have alleged facts sufficient to show that the defendants' treatment of the plaintiffs' applications violated the Free Exercise Clause because the Special Events Permitting Scheme was not applied in a way that was "neutral and respectful." Masterpiece Cakeshop, 584 U.S. at 634 ("The neutral and respectful consideration to which Phillips was entitled was compromised here . . . .").

Viewing their factual allegations in the light most

favorable to the plaintiffs, the plaintiffs have plausibly alleged that on several occasions a Commissioner characterized the Christmas Vigil as a display instead of a ceremony in "a transparent attempt to support his dismissive view that the Christmas Vigil is not a 'religious, spiritual, or worship-based,' activity." Compl. ¶ 94. See also id. ¶¶ 91-99, 106. The plaintiffs also allege that during the 2020 application hearing, another Commissioner "was more explicit, effectively raising an issue as to whether the Christmas Vigil was religious in nature." Id. ¶ 99. "As in Masterpiece Cakeshop, these statements are subject to various interpretations, some benign. But on a motion to dismiss, we must draw the inference most favorable to [the plaintiffs]." New Hope Fam. Servs., Inc. v. Poole, 966 F.3d 145, 168 (2d Cir. 2020) (footnote omitted). Here, these comments could be understood as members of the Commission engaging in the impermissible practice of evaluating the religious significance of the plaintiffs' claimed religious practice.

Therefore, the motion to dismiss is being denied as to as applied challenge in the Second Cause of Action.

### E. Fourth Cause of Action

The Fourth Cause of Action is a claim against the defendants for a violation of the Equal Protection Clause of the Fourteenth Amendment.

The Complaint states that the Fourth Cause of Action is for

"Violation of Fourteenth Amendment: Equal Protection (Facially and As Applied)." Compl at 36. The plaintiffs do not otherwise characterize their equal protection claim as a facial challenge, nor do they point to any particular language or provision in the Regulations or the Special Event Procedures as the basis for this claim, or otherwise respond to the defendants' argument that a facial challenge under the Equal Protection Clause has not been adequately pled. See Compl. ¶ 177; Defs.' Mem. at 7. Accordingly, the court concludes that the plaintiffs have abandoned any facial challenge with respect to the Fourth Cause of Action. See Leal, Inc. v. Twin City Fire Ins. Co., 573 F. Supp. 3d 648, 660-661 (D. Conn. 2021) ("A court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.") (internal quotation marks and citations omitted); Petitpas v. Martin, 2020 U.S. Dist. LEXIS 166185, at *7 n.3 (D. Conn. Sep. 11, 2020) (deeming a plaintiff's facial challenge under the Equal Protection Clause to have been abandoned where oral argument and subsequent briefing revealed that the plaintiff was challenging the policy only as it was applied to him and a number of allegations in the complaint "only [made] sense if understood as an as-applied equal protection claim"); Ramos v. Town of Vernon, 353 F.3d 171, 174 n.1 (2d Cir. 2003) (reasoning that a plaintiffs equal protection claim "is more

logically viewed [as an] 'as-applied' [claim] given the statements in the complaint" irrespective of the plaintiff "never . . . explicitly characteriz[ing the claim] as either facial or as-applied").

Where, as here, the plaintiffs do not claim to be members of a protected class in the Complaint, they "may bring an Equal Protection claim on one of two theories: selective enforcement or 'class of one.'" Komondy v. Gioco, 253 F. Supp. 3d 430, 440 (D. Conn. 2017). "To prevail on [a selective enforcement] claim, a plaintiff must prove that '(1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.'" Hu v. City of N.Y., 927 F.3d 81, 91 (2d Cir. 2019) (quoting Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir. 1995)). To prevail on a class of one claim, a plaintiff must prove that (1) they have "been intentionally treated differently from others similarly situated" and (2) "that there is no rational basis for the difference in treatment." Willowbrook v. Olech, 528 U.S. 562, 564 (2000). See also Hu, 927 F.3d at 91.

Although a plaintiff must identify a similarly situated

comparator under either theory, the degree of similarity
required differs in that the standard for a class of one claim
is "more stringent." Hu, 927 F.3d at 100. A selective
enforcement claim "merely requires a reasonably close
resemblance between a plaintiff's and comparator's
circumstances." Id. at 93 (internal quotation marks omitted). "A
plaintiff can prevail by showing that she was similarly situated
in all material respects to the individuals with whom she seeks
to compare herself." Id. at 96 (internal citation and quotation
marks omitted). In contrast, a class of one claim "requires an
extremely high degree of similarity between a plaintiff and
comparator." Id. at 93 (internal quotation marks omitted). A
plaintiff must show that:

> "(i) no rational person could regard the circumstances
> of the plaintiff to differ from those of the
> comparator to a degree that would justify the
> differential treatment on the basis of a legitimate
> government policy; and (ii) the similarity in
> circumstances and difference in treatment are
> sufficient to exclude the possibility that the
> defendants acted on the basis of mistake."

Id. at 94 (quoting Neilson v. D'Angelis, 409 F.3d 100, 105 (2d
Cir. 2005)).

    The defendants contend that the plaintiffs cannot state a
claim under either theory because they "failed to plead with any
specificity that they are similarly situated to alleged
comparators." Defs.' Mem. at 10. In the Complaint, the

plaintiffs identify several groups they contend are similarly situated, including: (i) charities and political groups which were permitted to place signs unattended for an entire month as a part of the Tree of Hope program, (ii) a group which was permitted to host a menorah lighting ceremony during December 2020, (iii) the Chamber of Commerce, which was permitted to hold a Santa Event, and (iv) local charities which were permitted to set up temporary ice rinks that remained overnight and for a duration of three days in 2017. The defendants argue that none of these groups rises to the level of similarity required under either theory because none were "seeking to change their location" to Sherman Green, nor were they "permitted to use the green for an overnight event" during the years the plaintiffs' applications were denied. Defs. Reply in Supp. of Mot. to Dismiss (ECF No. 28) at 8 (emphasis omitted).

Without making a finding as to the other alleged comparators, the court concludes that, at least, the fourth group satisfies the "reasonably close resemblance" requirement under the selective enforcement theory. The plaintiffs allege:

> For example, notwithstanding Nerreau's statements about there being no overnight use, a review of the Parks and Recreation Department's agendas and meeting minutes reveals that at meetings on January 17, 2017, and October 17, 2017, the Commission twice gave permission for local charities to set up temporary ice rinks overnight for three days at a time on the Sherman Green, with the names of the charities and their sponsors on display overnight.

Compl. ¶ 131. Like the Christmas Vigil, the ice-skating event
spanned three days, involved a structure being erected and left
overnight, was hosted by a private entity, and included a sign
identifying who was associated with the event. The defendants
offer no explanation as to why the fact that these events
occurred three years prior to the first denial of the
plaintiffs' application to use Sherman Green, or the fact that
the charities hosting the ice-skating events were not seeking to
change the location of their events from another park to Sherman
Green, constitute a material difference in circumstances.
Therefore, although "[d]iscovery in this case may render the
resemblance between the plaintiffs and their comparators less
than 'reasonably close,'" at this stage in the litigation, the
plaintiffs have sufficiently alleged at least one similarly
situated comparator under the selective enforcement theory. Hu,
927 F.3d at 97 (quoting Graham v. Long Island R.R., 230 F.3d 34,
40 (2d Cir. 2000)). See also id. ("The question of whether
parties are similarly situated is [generally] a fact-intensive
inquiry . . . . [I]t is precisely in light of the inquiry's
fact-intensive nature that we have cautioned against deciding
whether two comparators are similarly situated on a motion to
dismiss." (first alteration in original) (internal quotation
marks and citations omitted)).

However, the plaintiffs have not alleged facts sufficient to show that there is a similarly situated comparator under the class of one theory. The plaintiffs allege:

> 179. Plaintiffs are similarly situated with other groups that have been given permission to use Sherman Green and other public parks, including but not limited to, a menorah lighting ceremony, a Santa Claus event, and the Tree of Hope, each of which are sponsored by private parties that were permitted to put up displays at Sherman Green.
>
> 180. Plaintiffs are also similarly situated with the group that put up the ice hockey rink because both are private parties that wished to use the Sherman Green overnight for protected speech.
>
> 181. The Commission and the Director permitted the menorah lighting, the Chamber of Commerce Santa Event, the Tree of Hope, and over-night ice hockey rinks, but repeatedly denied Plaintiffs' request to hold the Christmas Vigil on Sherman Green.

Compl. ¶¶ 179-181. In opposition to the motion to dismiss, the plaintiffs simply assert that the:

> Defendants conveniently ignore the portions of the Plaintiff[s'] Complaint where the Plaintiffs have alleged that the Defendants have allowed Sherman Green to be used overnight for activities protected by the First Amendment as well as for charities relating to a temporary hockey rink. These allegations also satisfy the requirements for standing as a class of one . . . .

Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss (ECF No. 27) at 21.

These factual allegations are not sufficient to satisfy the requirement for a class of one claim that the plaintiff plead facts that show "an extremely high degree of similarity between

a plaintiff and comparator." Hu, 927 F.3d at 93 (internal
quotation marks omitted). The plaintiffs have simply identified,
in paragraph 179, one point of similarity with each of three
purported comparators, and in paragraph 181, one point of
similarity with a fourth purported comparator. In their
opposition, the plaintiffs point to no additional points of
similarity with respect to any of the four purported comparators
that could support a finding that there is an extremely high
degree of similarity between the plaintiffs and that comparator.

Therefore, the motion to dismiss is being granted to the
extent that the plaintiffs' seek to bring a facial challenge or
to rely on a class of one theory in the Fourth Cause of Action,
and it is otherwise being denied.

### F. Fifth Cause of Action

The Fifth Cause of Action is a claim against the defendants
pursuant to Article I, Sections 3, 4, and 14 of the Constitution
of the State of Connecticut. The defendants have moved to
dismiss this claim on the basis that there is no private right
of action under these Sections, and the plaintiffs do not
contest that point.

Therefore, the motion to dismiss is being granted as to the
Fifth Cause of Action.

### G. Sixth Cause of Action

The Sixth Cause of Action is a claim against the defendants

pursuant to the Connecticut Freedom of Religion Act ("CFRA"), Conn. Gen. Stat. § 52-571b, for violation of the plaintiffs' right of free exercise of religion under Article I, Section 3 of the Constitution of the State of Connecticut.

The CFRA provides that "[t]he state or any political subdivision of the state shall not burden a person's exercise of religion under section 3 article first of the Constitution of the state even if the burden results from a rule of general applicability" except where application of such a burden "is in furtherance of a compelling governmental interest, and . . . is the least restrictive means of furthering that compelling governmental interest." Conn. Gen. Stat. § 52-571b(a),(b). "Essentially, the CRFA requires the Court to apply strict scrutiny to a government action or law that burdens a plaintiff's exercise of religion." Omar Islamic Ctr. Inc. v. City of Meriden, 633 F. Supp. 3d 600, 625 (D. Conn. 2022).

The defendants make two arguments that this claim should be dismissed because the Town's regulations are not subject to the CFRA. Neither argument is persuasive.

First, the defendants argue that the CFRA applies only to generally applicable prohibitions against conduct, and the Regulations and the Special Event Procedures do not contain such provisions. The defendants note, correctly, that in Cambodian Buddhist Soc. of Connecticut, Inc. v. Plan. & Zoning Comm'n of

Town of Newtown, 285 Conn. 381 (2008), the Connecticut Supreme Court acknowledged that the CFRA was "enacted in response to the United States Supreme Court's decision in . . . Smith, [494 U.S. at 885]," which held that a generally applicable prohibition against socially harmful conduct does not violate the free exercise clause. Cambodian Buddhist, 285 Conn. at 423. But the Connecticut Supreme Court did not hold that the CFRA is applicable only to such prohibitions. Moreover, Regulation 11-(a) does, in fact, include a "generally applicable prohibition against conduct" because it prohibits, among other things, constructing temporary structures or hosting any sponsored gatherings in a town park without the permission of the Commission. Defs.' Mem. at 13.

Second, citing to Cambodian Buddhist and Omar Islamic Center, the defendants argue that "there is no indication that Connecticut intended § 52-571b to apply to even temporary uses of land such as the one proposed in the Knights' application." Id. See Cambodian Buddhist, 285 Conn. at 425 ("[W]e do not believe either that the legislature intended that the construction of a place of worship would constitute religious exercise or that . . . the application of land use regulations that are intended to protect the public health and safety to such a use generally would be subject to strict scrutiny under the statute."); Omar Islamic Center, 633 F. Supp. 3d at 626

("This Court is bound by the Connecticut Supreme Court's interpretation of Connecticut law, and must therefore hold that, just as the Buddhist society's request to build a temple on its land was not an 'exercise of religion' under the CRFA, Plaintiff's request to build a mosque on the Property is likewise not protected under the CRFA."). Thus, at issue in these cases was the applicability of the CFRA in the context of religious groups challenging generally applicable zoning regulations. In that context there was no need to address the applicability of the CFRA to applications made under a permitting scheme such as the Special Events Permitting Scheme at issue here, and there is nothing in either of these cases to suggest that the CFRA is not applicable to such a permitting scheme.

In any event "'the overarching purpose of § 52-57b was to provide more protection for religious freedom under Connecticut law than the' Free Exercise Clause." Doe v. Mastoloni, 2016 WL 593439, at *18 (D. Conn. Feb. 12, 2016) (quoting Rweyemamu v. Comm'n on Human Rights & Opportunities, 98 Conn. App. 646, 660 (2006)). See also Trinity Christian Sch. v. Comm'n on Human Rights & Opportunities, 329 Conn. 684, 691 (2018) ("The trial court further explained that, following Smith, the legislature enacted § 52-571b to ensure greater protection for the free exercise of religion under state law than is provided under the

federal constitution in the aftermath of <u>Smith</u>.") . The plaintiffs' claim under this Cause of Action parallels the First Amendment free exercise claim they bring in the Second Cause of Action. The court has already determined that the plaintiffs have alleged facts that state a claim with respect to the Second Cause of Action, and similarly, concludes that the plaintiffs have alleged facts that state a claim under the CFRA upon which relief can be granted with respect to the Sixth Cause of Action.

Therefore, the motion to dismiss is being denied as to the Sixth Cause of Action.

**H. Claims Against the Individual Defendants**

The defendants contend that claims against Calabrese and Nerreau in their official capacities should be dismissed as duplicative of the claims brought against the Town of Fairfield. <u>See</u> Defs.' Mem. at 13. ("Plaintiffs' suit against Anthony Calabrese and Brian Nerreau in their official capacities should be dismissed as they are the legal equivalent of claims against the municipality itself."). The plaintiffs do not dispute this point.[3] <u>See also</u> <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658, 691 n.5 (1978) (". . . official-capacity

---

[3] Rather than dispute this point, the plaintiffs state that they seek leave to amend the Complaint to add claims against the individual defendants in their individual capacity. Any such leave must be obtained by filing a motion for leave to amend the complaint under Federal Rule of Civil Procedure 15(a), and the defendants suggest they would oppose any such motion on the grounds of qualified immunity. Any such motion for leave to amend the complaint must be filed within 30 days and address the issue of qualified immunity.

suits generally represent only another way of pleading an action against an entity of which an officer is an agent . . .”); Kentucky v. Graham, 473 U.S. 159, 166 (1985) (“[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.”).

Therefore, the motion to dismiss is being granted as to all claims against defendants Anthony Calabrese and Brian Nerreau.

**III. CONCLUSION**

For the reasons set forth above, the Defendants' Motion to Dismiss (ECF No. 19) is hereby GRANTED in part and DENIED in part. The Fourth Cause of Action is dismissed to the extent that the plaintiffs' seek to bring a facial challenge or to rely on a class of one theory. The Fifth Cause of Action and all claims against the individual defendants are dismissed. The case will proceed against defendant Town of Fairfield on the remaining claims in the First, Second, Third, Fourth, and Sixth Causes of Action. Any motion for leave to amend the Complaint must be filed within 30 days.

It is so ordered.

Dated this 22nd day of August 2024, at Hartford, Connecticut.

_____
             /s/
        Alvin W. Thompson
      United States District Judge