**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| KNIGHTS OF COLUMBUS COUNCIL 2616, and JOSEPH P. SARGENT, Plaintiffs, | : | Civil No. 3:22-CV-1579 (AWT) |
| v. | : | |
| TOWN OF FAIRFIELD, ANTHONY R. CALABRESE and BRIAN NERREAU, Defendants. | : | |

**RULING ON MOTION TO ENFORCE SETTLEMENT AGREEMENT**

Defendant Town of Fairfield (the "Town") has filed a motion to enforce a settlement agreement it contends was reached by the Town and plaintiffs Knights of Columbus Council 2616 (the "Knights") and Joseph P. Sargent ("Sargent") during a September 23, 2025 conference with United States Magistrate Judge S. Dave Vatti; the individual defendants are being sued in their official capacities only, so the claims against them are claims against the Town. The Town also seeks attorney's fees and costs. For the reasons set forth below, the Town's motion is being granted.

## I. FACTS

The plaintiffs brought this action pursuant to 42 U.S.C. § 1983, seeking to enjoin the defendants from acting in a manner

that violated their rights guaranteed by the First and Fourteenth Amendments of the United States Constitution and in a manner that violated their rights under Sections 3, 4, and 14 of Article One of the Connecticut State Constitution and the Connecticut Freedom of Religion Act ("CFRA"). The complaint alleges that "[t]he Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367, as this case involves a claim for violations of constitutionally protected rights under 42 U.S.C § 1983." (ECF No. 1, Compl. ¶ 10.) After a ruling on the Town's motion to dismiss, the claims that remain in the case are: The First and Third Causes of Action (claims against the defendants for violation of the plaintiffs' First Amendment right to freedom of speech and right to peaceably assemble); Second Cause of Action (a claim for violation of the plaintiffs' First Amendment right to free exercise of religion); Fourth Cause of Action (a claim for violation of the Equal Protection Clause of the Fourteenth Amendment); and Sixth Cause of Action (a claim pursuant to the Connecticut Freedom of Religion Act ("CFRA"), Conn. Gen. Stat. § 52-571b, for violation of the plaintiffs' right of free exercise of religion under Article I, Section 3 of the Constitution of the State of Connecticut).

On October 1, 2024, this case was referred to Judge Vatti for a settlement conference. After preliminary conferences were held on October 8, 2024, January 7, 2025, and March 3, 2025, the

following settlement and/or status conferences were held by Judge Vatti (five of which were lengthy):

| | | | |
|---|---|---|---|
| 03/05/2025 ECF No. 69 | Settlement Conference | 1 hour and 12 minutes | Zoom |
| 03/21/2025 ECF No. 71 | Settlement Conference | 2 hours and 52 minutes | In person |
| 04/02/2025 ECF No. 73 | Settlement Conference | 1 hour and 3 minutes | In person |
| 04/04/2025 ECF No. 75 | Ex Parte Settlement Discussions | 8 minutes | Telephonic |
| 04/04/2025 ECF No. 76 | Ex Parte Settlement Discussions | 6 minutes | Telephonic |
| 04/14/2025 ECF No. 77 | Settlement Conference | 1 hour and 27 minutes | In person |
| 05/08/2025 ECF No. 79 | Status Conference | 22 minutes | Telephonic |
| 05/29/2025 ECF No. 81 | Status Conference | 12 minutes | Telephonic |
| 06/20/2025 ECF No. 83 | Status Conference | 3 minutes | Telephonic |
| 07/14/2025 ECF No. 85 | Status Conference | 8 minutes | Telephonic |
| 09/23/2025 ECF No. 91 | Status Conference | 12 minutes | Telephonic |

Status conferences were also held on October 17, 2025 (telephonic), where the Knights took the position that the case had not been settled, and on October 24, 2025 (in person), to follow up on the October 17, 2025 conference.

Either Dr. Manuel Rosales, who is the chief elected officer of the Knights, or Robert Madar, a member of the Knights, was present at each of the settlement or status conferences. Attorney Sargent was present at all of them in his dual capacity as counsel for the Knights and a plaintiff in this case. The Town was represented at all times by its counsel.

Judge Vatti identified three components of the settlement discussions: (i) reimbursement of attorney's fees incurred by the Knights; (ii) revisions to the Town's regulations being sought by the plaintiffs; and (iii) whether the Town would authorize the Knights to place a nativity scene on the Town Hall Green throughout December, to be purchased with Town funds. This nativity scene would be in addition to the one placed on the Sherman Green, and this issue was viewed as a significant one. There is no disagreement as to the fact that these were the three components of the settlement discussions. (See ECF No. 110, April 10, 2026 Hearing Tr. at 54:15-16 ("MR. SARGENT: That's a fair characterization, Your Honor.").)[1] Judge Vatti decided to address these three components sequentially.

By the end of the in-person conference on March 21, 2025, the parties had reached an agreement with respect to the

[1] With the exception of citations to deposition and hearing transcripts, the page numbers cited to in this ruling for documents that have been electronically filed refer to the page numbers in the header of the documents and not to the page numbers in the original documents, if any.

plaintiffs' demand for reimbursement of attorney's fee. The parties started out far apart, with the Knights making an initial demand of $500,000 and the Town's first offer being $5,000. There was much in the way of back and forth during the negotiations. The parties agree that eventually Judge Vatti used his skills of persuasion to get both sides to meet in the middle at $95,000. Judge Vatti's recollection is that he "was able to reach an agreement with the parties to a figure of $95,000 representing the attorney's fees. It was readily apparent to the Court that all parties were in agreement with that figure as one component of the settlement agreement." (ECF No. 103-2, Oct. 24, 2025 Status Conference Tr. at 4:15-19.)

At the hearing on April 10, 2026, however, Attorney Sargent attempted to argue that Judge Vatti never approved an agreement that the Town would reimburse the Knights in the amount of $95,000 for attorney's fees. This led to the following exchange:

> [The Court:] You're now telling me that without telling Judge Vatti you can undo that agreement, an agreement that's been approved by the court?
>
> MR. SARGENT: It was not approved, Your Honor, and it was obvious that it was part of a preliminary agreement because he asked us to come back. So, once they come back --
>
> THE COURT: Well, he didn't ask you to come back about the $95,000, did he?
>
> MR. SARGENT: No, Your Honor.

(April 10, 2026 Hearing Tr. at 58:12-21.)

The next component that was discussed was a revision to the Town's regulations. This was the topic of discussion beginning no later than April 2, 2025. The plaintiffs assert that on April 3, 2025, in an email sent to the Town's counsel (but not to Judge Vatti), Attorney Sargent made it clear that there was no agreement with respect to the terms discussed during the earlier settlement conferences. On April 2, 2025, at 5:31 PM, Attorney Sargent sent counsel for the Town an email stating:

> Jim, today was an avoidable waste of time when I have very little.
>
> What is the point of waiting till today to reject one of our basic settlement demands. If you told us this before we could have considered that position.
>
> I went there to clean up language, not renegotiate, which is what we are doing.

(ECF No. 104-12 at 2.)

Counsel for the Town responded on the morning of April 3, 2025 stating:

> Dear Joe – With respect, we disagree.
>
> Yesterday was a continuation of the settlement conference, during which we negotiated in good faith, compromised on the language that you wanted in the proposed amendments to the regulations, like plaintiff's proposed appeal from the Parks and Recreation Commission to the Board of Selectman.
>
> . . . .
>
> Per Judge Vatti's request, we will be sending you the

> proposed amendments to the regulations.
>
> Can you please let us know the date of the Knight's upcoming meeting, at which we understand they will review the proposed settlement, so we can be sure to get you the proposed amendments prior to your meeting?

(ECF No. 104-12 at 2.) A few minutes later, Attorney Sargent gave a one-word response: "No." Approximately two hours later, Attorney Sargent elaborated in an email to counsel for the Town:

> I left the first meeting with a clear understanding that we had an agreement but for the language of the regulations. My clients also had the same understanding. The regulations were something I knew we could address in a few minutes of conversation, which we did. I thought we had a deal.
>
> If the Town Hall Green was not already resolved, I would not have agreed to any numbers.
>
> This is a bait and switch.

(ECF No. 104-12 at 1.) Although the plaintiffs argue that this email shows they were reneging with respect to the agreement on attorney's fees, the email does not say that. Rather, it says "I would not have agreed to any numbers." Also, while Attorney Sargent asserted in his email that the issue with respect to the nativity scene at the Town Hall Green, i.e., the third component of the settlement discussions, had been resolved, that was not the understanding on the part of either the Town or Judge Vatti.

On April 4, 2025, i.e., the next day, Judge Vatti had ex parte settlement discussions with each of counsel for the Town and Attorney Sargent, respectively. Attorney Sargent did not

tell Judge Vatti that he believed the issue with respect to the nativity scene on the Town Hall Green had already been resolved and that the Town was attempting to back out of a deal, nor did he tell Judge Vatti that the plaintiffs were reneging with respect to the agreement on attorney's fees.

On April 8, 2025, counsel for the Town sent Attorney Sargent a revised draft of the regulations. The email read:

> In accordance with our discussion at the last settlement conference, attached are revised draft regulations——a clean version, and a version showing the changes from your latest draft. Please review and let us know if you have any comments or suggestions.

(ECF No. 104-13.) Attorney Sargent responded that day with a few comments.

Judge Vatti was actively involved in the negotiation with respect to the amended regulations. On October 24, 2025, counsel for the defendant made the following statement, which was not disputed:

> As your Honor knows, you helped draft the amended regulations and Attorney Sargent helped draft the amended regulations and we had significant back and forth, and then the Parks and Rec Commission had to have two separate readings of the amended regulations at the Knights' request and we built in an appeal process to the Board of Selectmen . . . .

(Oct. 24, 2025 Status Conference Tr. at 17:9-15.)

On May 7, 2025, counsel for the Town emailed Attorney Sargent, reporting that:

> Since our last discussions on the regulations, I

> attended both the Parks and Rec Commission meeting on April 23rd and the Board of Selectmen meeting on April 30th to discuss the proposed changes. Both of those groups are on board——I've attached an updated version with a few modifications for your review.

(ECF No. 104-14 at 1.) Attorney Sargent responded within less than an hour later, writing:

> I am not considering this as part of the settlement process since the mediation failed to close the gap on the Nativity, and our offer was rejected.
>
> I wanted to be clear on that and not cause any confusion.

(ECF No. 104-15.) The plaintiffs rely on the May 7, 2025 email to support their assertion that "[o]n May 7, 2025, the Knights wrote back reiterating that they were not continuing earlier settlement discussions until the Nativity Scene was treated equally." (ECF No. 104, Obj. Mot. Enforce Settlement Agreement at 11.) Attorney Sargent has never provided (not then and not now) a plausible explanation of how amendments to the regulations that were worked out during settlement conferences with Judge Vatti were not part of the settlement process. Nor did Attorney Sargent tell Judge Vatti during the status conference the next day, i.e., May 8, 2025, that the amendments to the regulations were not part of the settlement process.

Attorney Sargent did not tell Judge Vatti at the May 29, 2025 status conference that he was taking this position. Nor did Attorney Sargent say anything about it at the June 20, 2025

status conference.

With respect to the time and effort it took to get approval of the amended regulations, the Town explained:

> Thereafter, the process to have the agreed-upon negotiated amended regulations approved by the Town's Parks and Recreation Commission was cumbersome and time-consuming, consisting of extensive phone and electronic communications with the Town and attendance of various Town meetings on April 23, May 14, May 21, and August 20. First, the proposed amendments needed to be explained to the Commission; then, two additional separate meetings were required to post the draft amendments and allow for public comment. In addition, the Board of Selectmen needed to be consulted regarding its new anticipated role as a board of appeals for potential application denials by the Commission. Finally, on August 20, the Commission approved the amended regulations, satisfying the second settlement term and a core component of plaintiffs' theory of recovery in this case.

(ECF No. 103-1, Mem. Law Supp. Mot. Enforce Settlement Agreement at 4.)

At the hearing on April 10, 2026, Attorney Sargent asserted that there was no final agreement with respect to the amended regulations. The following exchange took place:

> THE COURT: So you were not involved in sessions where you sat down and marked up the regulations?
>
> MR. SARGENT: We did and then Judge --
>
> THE COURT: With Judge Vatti?
>
> MR. SARGENT: Yup and then [Judge Vatti] asked us to come back because there was a, you know, we scratched up the regulation, but there was no final agreement. We went back and exchanged drafts which is one of the exhibits. But we -- the Town rejected everything we asked for just across the board. So we, there was

> never -- and then, by the time we came back on the 14th, after that was when they came back and didn't accept the Nativity scene. So, they didn't -- we never reached an agreement because they rejected all of our -- all of our redlines were rejected flatly.
>
> THE COURT: All of your redlines – we're talking about just the regulations right now.
>
> MR. SARGENT: The regulations. We made certain, some of them were accepted, but –
>
> THE COURT: Well, you said all of them were rejected.
>
> MR. SARGENT: I apologize, Your Honor. I misspoke.

(April 10, 2026 Hearing Tr. at 53:8-54:5.) It is implausible that the Town, which was seeking to settle this case, would have proceeded to go through all of the steps that were required to adopt the amended regulations without an agreement that those amended regulations would resolve that aspect of the case.

On July 12, 2025, representatives of the Knights met with their attorney to discuss an offer made by the Town on June 13, 2025. Dr. Rosales "decided to propose that the Knights still wanted the Town to pay for and place a Nativity Scene on the Town Hall Green, but if they refused, we would pay for it," and that "given these facts, that was as far as I would go." (Obj. Mot. Enforce Settlement Agreement at 12.)

It appears that this offer was communicated during the status conference on July 14, 2025. The minute entry for that status conference reads: "The parties are continuing to make progress towards a settlement of this matter. The Settlement

Judge will conduct a phone call with the parties on August 18, 2025, to determine if a final settlement can be concluded.” (ECF No. 85.) The plaintiffs had not told Judge Vatti that they had reneged with respect to the agreement on attorney’s fees or that the amended regulations were not part of the settlement discussions.

On October 24, 2026, Judge Vatti summarized his understanding of what had happened up to this point in time:

> During the course of those initial sessions the settlement discussions focused on the issue of reimbursement of attorney’s fees incurred by the Knights of Columbus and ultimately the settlement judge, myself, was able to reach an agreement with the parties to a figure of $95,000 representing the attorney’s fees. It was readily apparent to the Court that all parties were in agreement with that figure as one component of the settlement agreement.
>
> The next component of the settlement agreement that was the subject of settlement discussions that occupied April of 2025 were revisions to the Town of Fairfield regulations that were sought by the Plaintiffs. That was the subject of extensive discussion, some back and forth submission of drafts, but ultimately there was an agreement reached with respect to revision of the regulations which was ultimately approved by the Town of Fairfield.
>
> At no point prior to that did either Attorney Sargent in his personal capacity or on behalf of the Knights of Columbus indicate that the $95,000 in attorney’s fees was not binding or that the agreement with respect to the revised regulations and the subsequent town approval was not a component of the settlement either.
>
> In the settlement judge’s view that left only one final issue, which was a significant issue, which was the request by the Knights of Columbus to have a

> nativity scene placed on the Town Green with the payment of those costs to be made by the Town of Fairfield. That was a significant sticking point but as of mid-July of 2025 it was the only sticking point left between the parties, which is reflected in a minute entry on the docket at ECF 85, July 14th, 2025, in which I noted on the docket that the parties are continuing to make progress towards a settlement of this matter, the settlement judge will conduct a phone call with the parties on August 18th, 2025 to determine if a final settlement can be concluded.

(Oct. 24, 2025 Status Conference Tr. at 4:11-5:22.)

On July 22, 2025, counsel for the Town wrote to Attorney Sargent. He first referenced the death of the Town's First Selectman, and then stated:

> That said, attached please find the proposal we had sent you back on April 11, 2025. Per our last discussion with Judge Vatti, it's my understanding that you agreed to mark this up and send it back as a Redline version to indicate plaintiffs' latest proposal to have the Knights pay for a Creche.
>
> I'm not sure how that new proposal will be received by the decision makers who, as you know, will now include a new First Selectman. But I suspect that, at the very least, if they are open to this new proposal we'll need some hold/harmless language indicating that the Knights will defend and indemnify the Town if there are any claims by anyone who may challenge the display of the Creche.

(ECF No. 104-18.)

On August 18, 2025, counsel for the Town followed up about a written redlined proposal from the plaintiffs: "You were going to get back to us with a written redline proposal regarding plaintiffs' latest counter offer about the Creche. Can you please add plaintiff's proposal terms to the attachment

hereto so we can share with our clients?" (ECF No. 104-19 at 1.)

A couple of hours later, Attorney Sargent replied:

> While I try to move towards resolution, there is no point in doing so on the failed efforts at the first day.
>
> I would never have agreed to any terms if there was such a wide misunderstanding.
>
> If we have a tentative agreement as to all the missing part, I will revisit the two other aspects.
>
> But I am not putting any more time [into] it.

(ECF No. 104-19 at 1.)

The plaintiffs cite to this August 18, 2025 email to support their position that the plaintiffs wrote to the Town "on August 18, 2025, more than a month before the next settlement conference on September 23, 2025," "in order to remove any doubt about whether the future settlement discussions would rely on the initial terms discussed on the first day of mediation[.]" (Obj. Mot. Enforce Settlement Agreement at 14.)

But Attorney Sargent had never even suggested to Judge Vatti that the plaintiffs were reserving the right to "revisit" the issue of attorney's fees and the issue of the amended regulations.

Judge Vatti scheduled a status conference for September 23, 2025. On September 22, 2025, the Knights submitted two special event applications to the Parks and Recreation Commission: "one

to renew their Sherman Green nativity scene for December 23-25, 2025, and a second seeking to place an additional nativity scene on the Town Green throughout December." (Mem. Law Supp. Mot. Enforce Settlement Agreement at 6.) The second application stated: "It would be preferable if the Town purchased the Nativity Scene, just as they purchased the Menorah, but if that becomes a burden to allow us to place the Nativity Scene on the Town Hall Green, we will be happy to do so with private funds." (ECF No. 103-14 at 3.) "Pursuant to Parks and Recreation regulations, the new application was placed on the agenda for the next Commission meeting, scheduled for October 15." (Mem. Law Supp. Mot. Enforce Settlement Agreement at 6.)

"Following receipt of plaintiffs' new application, and because plaintiffs had still not provided the Town with a formal proposal setting forth their July 14 settlement offer, [counsel for the Town] emailed plaintiffs' counsel inquiring whether the new submission was a memorialization of the offer." (Mem. Law Supp. Mot. Enforce Settlement Agreement at 7.) On September 22, 2025, counsel for the Town wrote to Sargent:

> We obtained Board of Selectman approval for the original settlement, which we previously provided to you in writing.
>
> We also obtained Park & Recreation Commission approval for the amended regulations, which are part of the settlement.
>
> From our perspective, all that is required is for

> plaintiffs to signal their agreement to the settlement recommended by Judge Vatti.
>
> We are in receipt of your application to the Parks & Recreation Department, dated today, September 22. It appears that your application differs in several material respects from prior applications.
>
> We remain committed to finding an amicable resolution of this dispute, but are confused by your latest submission. Is this a new settlement proposal?

(ECF No. 104-22 at 1.)

The next morning, September 23, 2025, Sargent responded: "I attached two new applications. [T]hese are not part of a new settlement proposal." (ECF No. 104-22 at 1.) The plaintiffs cite to their September 23, 2025 email to support their assertion that "[o]n September 23, []2025, approximately an hour before the continuation of the settlement conference, the Knights made it clear that the applications 'are not part of a new settlement proposal.'" (Obj. Mot. Enforce Settlement Agreement at 15.)

Judge Vatti held a telephonic status conference on September 23, 2025. In their opposition, the plaintiffs describe that status conference as follows:

> The mediation conference on September 23, 2025, lasted 12 minutes. It started with the Knights explaining that the only pending offer was theirs from July 14, 2025, which apparently was rejected because it never appeared on the BOS agendas. The Town's attorney confirmed that the Town rejected the July 14 offer but went on to explain that he was "cautiously optimistic" by the Knights' recent applications to the Commission, and that he believed he could work behind

> the scenes to [s]ee if he could make progress. The conversation was very memorable because seconds earlier the Town's attorney confirmed that the Town rejected the proposal from July 14, which was identical to the content of the application to the Commission. It did not make sense. The Town attorney made even more bizarre statements in the transcript from the October 24, 2025, mediation conference when he stated that the applications, to the Commission was "an ah-ha moment" and a "breakthrough.." Motion to Enforce, Exhibit A, at 15. If the Town's attorney is to believed, he received settlement proposal July 14, 2025, which he rejected during the September 23 conference call, and then he claims that the exact same proposal became a "breakthrough." The Town's attorney is plainly being distinguished [disingenuous?] and was trying to manipulate Magistrate Judge Vatti and this Court.
>
> In any event, after the Town interjected the municipal application into the conference the Knights attorney explained that this was not part of a settlement proposal and also explained that there will be another application to the BOS seeking the same relief, to be heard at the BOS's next meeting was on October 1, 2025. Madar Decl. ¶34-35. The Knights were clear that this was not part of any settlement offer. The Knights explained that the public application was intended to get a public response and the Knights hoped to achieve politically what the Town would not do as part of settlement discussions. Id. Magistrate Judge Vatti asked if that would address our demands about the Nativity Scene, and Knights attorney responded "yes, it would be moot." The Knights attorney recalled response because he had just explained that the applications were not part of any settlement proposal. The Judge said he was optimistic because he knew the Town's attorney had a good deal of municipal experience. Judge Vatti asked when these meetings were scheduled, and after being told October 1 and October 15, 2025, he asked the parties to report back on October 17, 2025. There was no discussion of an offer, acceptance, settlement or agreement. It would have been odd to do so since the applications were not part of any settlement proposal.

(Obj. Mot. Enforce Settlement Agreement at 15-17.)

In the plaintiffs' opposition, they rely on the declaration submitted by Robert Madar. Paragraphs 34 and 35 of Madar's declaration purport to describe what happened during the September 23, 2025 status conference. They read as follows:

> At the start of the remote conference on September 23, 2025, Attorney Sargent explained that he had been monitoring the Board of Selectmen's ("BOS") meeting agendas and minutes, and that the BOS did not hold a meeting to address our proposal, and that we considered it rejected. The Town's attorney did not dispute Attorney Sargent's observations, but he explained that because the Knights had submitted an application for a special events [permit] to the Parks and Recreation Commission ([]the "Commission") seeking to have the Town place and pay for the Nativity Scene to be on the Town Hall Green, and failing that, the Knights would pay, he felt that there was some possibility for a settlement. Attorney Sargent explained that this application, along with a similar one to the BOS were not part of any settlement proposal. We were seeking a public response to the Town's rejection of our requests to go forward. The Town's attorney indicated that he would meet with the Board of Selectmen and the Commission to move the application forward.
>
> The Judge asked Attorney Sargent if that would resolve the Nativity Scene issue, Attorney Sargent said "yes, it would be moot because it was resolved." The Judge asked when the meeting is with the BOS and Commission were scheduled, and asked us to report back on October 17, 2025.

(ECF No. 104-2, Madar Decl. ¶¶ 34–35.) The description of the September 23, 2025 conference in the plaintiffs' opposition and in Madar's declaration is not credible.[2] It is at odds in

[2] The court had Madar testify at the April 10, 2026 hearing, and he proved to be an unreliable witness with respect to the September 23, 2025 status conference, even with the benefit of his declaration to refresh his

material respects with the recollections of Judge Vatti as to what transpired, the content of an email Judge Vatti sent immediately after that conference, the recollections of counsel for the Town as to what transpired, and the statements made by Attorney Sargent during a hearing on October 24, 2025 about what happened during the September 23, 2025 status conference. Moreover, it is implausible that, had the September 23, 2025 settlement conference gone as described by the plaintiffs, it would have lasted only 12 minutes without Judge Vatti scheduling an immediate follow-up conference. Judge Vatti certainly would have been sufficiently perturbed (as in fact he was on October 17, 2025) that he would have had a number of questions and/or would have summoned the parties in for an in-person status conference -- as he did on October 17, 2025.

On October 24, 2025, Judge Vatti stated the following with respect to the September 23, 2025 status conference:

> Ultimately on September 23rd, 2025 I had a telephonic status conference with the parties to follow up on issues related to the nativity scene. During that telephonic status conference it was reported to me by the parties that the Knights of Columbus were no longer seeking to have the Town of Fairfield pay for the nativity scene. I distinctly recollect feeling relieved that what was a significant obstacle to settlement had been removed.
>
> It was represented to me that the Knights were going to submit an application for approval to the Fairfield Park & Rec Commission to have a nativity

---

recollection. (See April 10, 2026 Hearing Tr. at 25:10-11 ("THE WITNESS: I can't recall if [Judge Vatti] said that or not.").)

> scene on the Green that they would pay for, and it was also mentioned to me that the vote was planned for October 15th by the Fairfield Park and Rec Commission.
>
> In light of the information provided to me I directly asked Attorney Sargent if the Fairfield Park and Rec Commission voted to approve the nativity scene with the Knights paying for it, whether we were concluded with the settlement in this case, and I think the exact words I used were "are we done?" Attorney Sargent represented that was in fact the case. His client representative, Mr. Madar, was on the call as well.
>
> After the call, given the information that was relayed to me, I emailed the presiding judge, Judge Thompson, on the same date at 10:52 a.m. . . . .

(Oct. 24, 2025 Status Conference Tr. at 6:3-7:2.) Judge Vatti's email stated:

> There is one final component of a settlement agreement that will be up for a vote before the Fairfield Park and Rec Commission on October 15th. I am cautiously optimistic that with some diplomacy leading into that vote by Defense counsel that the necessary approval may be maintained and I hope to be able to report a settlement when we have our next scheduled phone conference on October 17th.

(Oct. 24, 2025 Status Conference Tr. at 7:6-13.)

A short while later on October 24, 2025, in response to a statement by Attorney Sargent to Judge Vatti that "what's missing from your perspective is the five months of emails back and forth between the parties[,]" (Oct. 24, 2025 Status Conference Tr. at 12:5-7), Judge Vatti stated, and Attorney Sargent replied:

> THE COURT: All right. I'll put one thing on the record in response to that. Irrespective of whatever

> emails and phone calls you might have had without the Court present with Attorney Tallberg, the bottom line here is in that phone call on September 23rd, 2025, I asked you point blank whether we were done if the Town of Fairfield Park and Rec Commission approved the nativity scene application at the Knights' cost on October 15th, and you said yes with your client present on the phone.
>
> MR. SARGENT: Yes, your Honor.
>
> THE COURT: And Mr. Madar, who is here in Court today sitting next to you was present on that phone call.
>
> MR. SARGENT: He was, your Honor.
>
> THE COURT: So I don't know how you could have possibly understood me to refer to anything else other than the $95,000 that had been agreed to for attorney's fees, my revised regulations that had been approved, and now the last piece which was the approval by the Fairfield Park and Rec Commission. So irrespective of what you think occurred, at no point during the phone call did you say we now have to revisit these other issues. We are not done.
>
> MR. SARGENT: I agree with that, your Honor.

(Oct. 24, 2025 Status Conference Tr. at 12:9-13:6.)

Counsel for the Town said the following with respect to his recollection of the status conference on September 23, 2025:

> And we had the ah-ha moment on September 23 when the only comment I would make about the record, there was one issue, I think your Honor said that at the September 23 teleconference that the Knights would submit an application.
>
> What actually happened is the day before on September 22nd, the Knights submitted a formal special permit application to the Parks and Rec Commission, so we had no doubt about what would be contained in that application when we met with your Honor and Attorney Sargent and Mr. Madar on September 23rd. We already had

> the application, and the ah-ha moment was the Knights' application said that while they would prefer for the Town to pay, if that -- and this is I'm quoting from their special permit application dated September 22. "If that becomes a burden to allow us to place the nativity scene on the Town Hall Green, we will be happy to do so with private funds." And that was the breakthrough after a year of negotiations on this case, that one final sticking point had finally been resolved.
>
> And I'll never forget your Honor saying, Attorney Sargent, if the Parks and Rec Commission approves that application that had already been filed the day before at it's next meeting on October 15, are we done? Is the case settled? And he said yes. Crystal clear. I don't remember any qualification.

(Oct. 24, 2025 Status Conference Tr. at 14:25-15:25.)

During the status conference on October 24, 2025, in response to an observation by Judge Vatti that he believed "both Attorney Sargent in his individual capacity as well as the Knights of Columbus" had reneged on a binding settlement agreement (see Oct. 24, 2025 Status Conference Tr. at 9:14-19), Attorney Sargent stated, with respect to what transpired on September 23, 2025:

> To the extent that the Court might have not understood that we had rejected any obligation to be bound by a partial discussion with respect to attorney's fees and any other such things earlier, perhaps we didn't present it to the Court but that was clearly the understanding in writing between the parties.

(Oct. 24, 2025 Status Conference Tr. at 10:15-20.) The Town disagrees, and Attorney Sargent has not identified any such writing between the parties.

At another point during the status conference on October

24, 2025, Attorney Sargent asserted with respect to the September 23 status conference, "but during that conversation I did not have authority to enter into any settlement agreement." (Oct. 24, 2025 Status Conference Tr. at 11:24-25.) However, he did not address then, and does not address now, the fact that he is not only the attorney for the Knights in this case, but also a plaintiff in his individual capacity, and he clearly had authority to enter into a settlement agreement on his own behalf. Nor does Attorney Sargent address the fact that when Judge Vatti asked "are we done", neither Attorney Sargent nor Mr. Madar suggested that they did not have the authority to respond to that question on behalf of the Knights.

On October 10, 2025, counsel for the Town sent an email to Attorney Sargent "[t]o follow up on our discussions, including the discussion at the September 23, 2025 status conference with Judge Vatti," stating that he wanted to "confirm the final details of the proposed settlement." (ECF No. 103-17 at 2.) He also informed Attorney Sargent that he "anticipate[d] this being on the agenda for the Parks & Recreation Commission agenda for next week, October 15, 2025." Id. In addition, he asked for instructions with respect to the payee of the $95,000 check. See id.

Attorney Sargent responded less than an hour later: "Jim, I am not looking at this until the Town Hall Green issue is

finalized. I have wasted months on something that should have been a nonissue but for religious bigotry." (ECF No. 103-18 at 2.)

On October 15, 2025, the Knights submitted to the Town what Attorney Sargent described as "a slightly modified request for the Nativity Scene on the Town Hall Green." (ECF No. 103-19 at 2.) A copy was sent to counsel for the Town, who sent the following message to Attorney Sargent:

> Attorney Sargent- It's my understanding that your original application, which you sent us on September 22, is on the agenda.
>
> Under FOIA, there is a 24 hour requirement for posting. It is too late [to] submit a new application, and what you just sent us is inconsistent with what you agreed to during the settlement conference on September 23 with Judge Vatti, and will not the addressed tonight.

(ECF No. 104-25 at 2.) Attorney Sargent responded that there had been proper notice with respect to the amended application. He stated: "We unilaterally submitted the application without any consideration from the Town. It follows logically that we can also change the application on behalf of the K of C unilaterally. Such minor changes are typical." Id.

But the Knights had not submitted a "slightly modified request" reflecting "a minor change." Paragraph 1 of request stated:

> We therefore respectfully request:
>
> 1. The Town purchase a Nativity Scene at approximately

> the same price it paid for the Menorah in 2024. If any additional funds are needed, for instance for security purposes, additional funds may be donated by private parties.

(ECF No. 103-7 at 3.) In the same email in which Attorney Sargent stated that there had been proper notice, he also stated: "We agreed to postpone the mediation efforts before Judge Vatti until after we receive responses with respect to the request to the Board of Selectmen and the Commission." (ECF No. 104-25 at 1.) However, there had been no such agreement.

At its meeting on October 15, 2025, the Parks and Recreation Commission approved the September 22, 2025 application to have the nativity scene placed on the Town Hall Green for the month of December and be paid for by private funds. The amended request was not heard.

On October 17, 2025, Judge Vatti held a status conference, after which the October 24, 2025 in-person conference was scheduled. On October 24, 2025, Judge Vatti made reference to the October 17, 2025 status conference, and then he continued as follows:

> I have been informed today -- actually I was informed in a phone call which took place last week on October 17th, 2025 which is reflected at ECF 93, that the Knights insisted now that the Town of Fairfield pay for the nativity scene. In response to that I scheduled an immediate in-person settlement conference to clarify the situation. Today is October 24th, 2025 at 10:00 a.m. I scheduled a conference for October 24th, 2025 at 10:00 a.m. During the course of the conference Attorney Sargent informed me that he does

> not believe that there is a settlement agreement. He informed me that he does not believe there was any binding agreement as to the $95,000 in attorney's fees. I have given him and his client a chance to confer. They continue to maintain that position.
>
> In this Court's view that position has no credibility whatsoever. I believe that we spent significant time negotiating the attorney's fees issue and at no time prior to this morning, October 24th, 2025, has Attorney Sargent ever informed the Court that the $95,000 in attorney's fees had not been agreed to and that it was continuing to be binding once it was agreed to.
>
> The Court is very disappointed in what has occurred, but I will reiterate that I believe that there is a binding settlement agreement here that has been essentially -- there's no need to mince words -- reneged on by both Attorney Sargent in his individual capacity as well as the Knights of Columbus.

(Oct. 24, 2025 Status Conference Tr. at 8:17-9:19.)

Near the end of the October 24, 2025 status conference, Judge Vatti stated the following with respect to the status conference on September 23, 2025:

> So let me add a couple of things based on comments you've made today. You've referenced several times that the phone conference on September 23rd lasted 11 minutes. That phone conference for the 23rd of September was scheduled on August 18th, 2025 at ECF 89 and docketed at that point. So you had roughly more than four weeks' notice that we were having the call on the 23rd. There could be no doubt as to what the purpose of the call on the 23rd was, it was the status of settlement discussions.
>
> So again I come back to the point of no matter what was transpiring between you and Attorney Tallberg in emails or phone calls, when I asked you point blank whether we were done and had a settlement, you didn't say no, Judge, I don't think we have a binding settlement because there are remaining issues to be

> discussed such as the attorney's fees amount based on changed circumstances. No, Judge, we don't have a binding settlement because there are some issues regarding this nativity scene application that we don't like how it went down and therefore we are not comfortable at this moment saying that there is a binding settlement agreement. You didn't say, well, Judge, my client needs to convene a meeting of its Board of Directors in order to officially accept the settlement agreement.
>
> You had five weeks to prepare for the phone call and when I asked you the point blank question that if the Park and Rec Commission approved the application that apparently is dated September 22nd, 2025, the day before the conference, are we done, do we have a settlement. You said yes.

(Oct. 24, 2025 Status Conference Tr. at 20:23-22:3.)

There followed an exchange with Attorney Sargent at the end of which Judge Vatti stated:

> [T]he problem is all the stuff you've said today was not said on the phone call the 23rd. In fact, the exact opposite was said which is we're done, we have a settlement.

(Oct. 24, 2025 Status Conference Tr. at 23:16-19.)

Towards the end of the October 24, 2025 status conference, Attorney Sargent stated that on August 14, 2025, the plaintiffs had made an offer that the Knights would pay for the nativity scene if the Town would not pay for it, and they came to the September 23 status conference to get a response from the Town to that offer, and that the offer was rejected by the Town during the September 23 status conference. That simply did not happen. However, it appears that the offer being referred to is

the offer that was made during the status conference on July 14, 2025, and contrary to Attorney Sargent's statement, as reflected in the July 22, 2025 and August 18, 2025 emails to Attorney Sargent from counsel for the Town, the Town was waiting for the plaintiffs to provide the Town with a written redlined proposal regarding that counteroffer.

Finally, at the end of the October 24, 2025 hearing, Judge Vatti informed the parties that he would recuse himself from any further involvement in settlement of this matter.[3] He also stated:

> I also think based on what has transpired today that the Knights of Columbus are well advised to seek advice of separate counsel as to how they wish to proceed. Obviously it's their choice whether to do so or not.

(Oct. 24, 2025 Status Conference Tr. at 24:15-19.)

## II. LEGAL STANDARD

The plaintiffs bring this action pursuant to 42 U.S.C. § 1983 and state there is federal question and supplemental jurisdiction for their claims. "In a federal question case,

---

[3] During the hearing on April 10, 2026, Attorney Sargent suggested that the court should not rely on any statements made by Judge Vatti during the October 24, 2025 status conference. He said, "I don't have any opportunity to cross-examine him or to ask him about different exhibits." (April 10, 2026 Hearing Tr. at 45:20-21.) When the court pressed Attorney Sargent to explain, the exchange that took place ended as follows:

> THE COURT: Well, so there's nothing you would ask Judge Vatti about?
>
> MR. SARGENT: No, Your Honor.

(April 10, 2026 Hearing Tr. at 46:11-13.)

such as this one, 'the question of whether federal or state law controls the enforceability of a settlement agreement . . . is an open one.'" McKinney v. New Haven Police Dep't, No. 3:17CV01663(JCH), 2020 WL 5836019, at *4 (D. Conn. June 1, 2020) (quoting Figueroa v. New York City Dep't of Sanitation, 475 Fed.Appx. 365, 366 (2d Cir. 2012)). "The Second Circuit, much like many other circuit courts of appeal, has not clarified which law, federal common law or Connecticut law, governs when a court must decide whether to enforce a settlement agreement in a case arising under federal question jurisdiction." Id.

Winston v. Mediafare Entm't Corp., 777 F.2d 78 (2d Cir. 1985) is frequently cited as the source of the federal common law test to evaluate whether parties entered into a binding agreement in the absence of a document executed by both sides. There the court stated, "[i]n any given case it is the intent of the parties that will determine the time of contract formation." Winston, 777 F.2d at 80. "To discern that intent a court must look to the words and deeds of the parties which constitute objective signs in a given set of circumstances." Id.

> We have articulated several factors that help determine whether the parties intended to be bound in the absence of a document executed by both sides. The court is to consider (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the

type of contract that is usually committed to writing. Id. "No single factor is decisive, but each provides significant guidance." McKinney, 2020 WL 5836019, at *4 (quoting Ciaramella v. Reader's Digest Ass'n, Inc., 131 F.3d 320, 323 (2d Cir. 1997)). "The test is not an after-the-fact professed, subjective intent, but rather the parties' objective intent as manifested by their expressed words and deeds at the time." Id.

"The Connecticut Supreme Court has held that '[a] contract is not made so long as, in the contemplation of the parties, something remains to be done to establish the contractual relation.'" Omega Eng'g, Inc. v. Omega, S.A., 432 F.3d 437, 444 (2d Cir. 2005) (quoting Klein v. Chatfield, 166 Conn. 76, 80 (1974)) In Omega, the court stated that in determining whether a party "assented to the contract without signing," "[t]he parties' intent is determined from the (1) language used, (2) circumstances surrounding the transaction, including the motives of the parties, and (3) purposes which they sought to accomplish." Id.

## III. DISCUSSION

"Because the Second Circuit has not directly decided which test to apply, this Court, like other district courts, will consider the enforceability of the settlement agreement under both federal common law and Connecticut law." McKinney, 2020 WL

5836019, at *4 (cleaned up). See also Can't Stop Prods., Inc. v. Slxuvus, Ltd., No. 17CV06513(CS)(LMS), 2019 WL 5773739, at *5 (S.D.N.Y. Jan. 18, 2019); Gonzalez v. Jurella, No. 3:14CV01250(AWT), 2015 WL 9943596, at *2-*5 (D. Conn. Sept. 22, 2015); E.E.O.C. v. Beauty Enters., Inc., No. 3:01CV378AHN, 2007 WL 3231692, at *2 (D. Conn. Oct. 31, 2007).

The court concludes that the Town's motion to enforce the settlement agreement should be granted no matter which test is applied.

**A. The Winston Test**

It is significant that what matters is the "the parties' objective intent as manifested by their expressed words and deeds at the time" as opposed to their "professed, subjective intent." McKinney, 2020 WL 5836019, at *4. In support of their position that there was no agreement to settle the case, the plaintiffs rely principally on the emails back and forth between Attorney Sargent and counsel for the Town. For example, Attorney Sargent told Judge Vatti at the October 24, 2025 status conference that what was missing from Judge Vatti's perspective was the five months of emails back and forth. He also explained, "my subjective understanding was informed by a history of discussions and communications with the Town's attorney. . . . but subjectively I did not understand that by saying yes . . . ." (Oct. 24, 2025 Status Conference Tr. at

14:4-8.) But any such subjective intent Attorney Sargent had was contrary to his words and deeds. Attorney Sargent and his client never communicated to Judge Vatti an intent not to be bound by the resolution reached during the settlement conferences with Judge Vatti with respect to any of the three components of the settlement discussions. Also, to the extent the plaintiffs suggest that counsel for the Town had an obligation to be guided by statements made by Attorney Sargent outside the settlement and status conferences with Judge Vatti, as opposed to being guided by the discussions with Judge Vatti during the settlement and status conferences, the court disagrees. As officers of the court, counsel for both sides had an obligation to honor the representations made to Judge Vatti, and counsel for the Town should have proceeded, and did proceed, accordingly. It is hard to take seriously a statement by an attorney that he has decided that he is no longer bound by an agreement he and his client reached with the judge during a settlement conference.

**1. Whether There Has Been an Express Reservation of the Right not to be Bound in the Absence of a Writing**

The context here is a series of settlement and status conferences presided over by Judge Vatti, during which the three components of the settlement discussions were being addressed sequentially. While the parties at times exchanged writings

setting forth their respective positions with respect to each of the three components of the settlement discussions, neither side ever expressly reserved, either to the opposing party or to Judge Vatti, the right not to be bound in the absence of a writing.

The plaintiffs now argue that "there's all sorts of preliminary understandings going back and forth . . . It was never a final agreement." (April 10, 2026 Hearing Tr. at 67:16-17, 67:22-23.) However, neither side ever told Judge Vatti at the time that the resolution of any of the three components of the settlement discussions was only a preliminary understanding and that there would be no final agreement until the terms were reduced to a written settlement agreement.

Thus, this factor suggests that the parties intended to be bound.

**2. Whether There Has Been Partial Performance of the Contract**

The Town agreed to pay $95,000 to reimburse the plaintiffs for attorney's fees and was prepared to make that payment but has not done so because the plaintiffs took the position that there has been no agreement to settle the case. With respect to the revisions to the Town's regulations, however, the Town has fully performed in accordance with the resolution agreed upon during the settlement discussions with Judge Vatti. There is

no support for the plaintiff's position that the amendments to the regulations were not part of the settlement discussions even though Judge Vatti was actively involved in the negotiations with respect to the amended regulations. As discussed above, the amended regulations were approved by the Town's Parks and Recreation Commission after a series of meetings and adopted by the Commission on August 20, 2025. With respect to the third component of the settlement discussions, the Parks and Recreation Commission approved the Knights' September 22, 2025 application on October 15, 2025.

Thus, there has been partial performance of the contract, and this factor suggests that the parties intended to be bound.

**3. Whether All of the Terms of the Alleged Contract Have Been Agreed Upon**

There were three components of the settlement discussions. An agreement was reached with respect to $95,000 for reimbursement of the plaintiffs' attorney's fees early in the process. While Attorney Sargent contends that the plaintiffs reneged with respect to this agreement, they never informed Judge Vatti that they wanted to do so.

The second component was the amendments to the regulations. As discussed above, after negotiations in which Judge Vatti was actively involved, a set of amended regulations was submitted to the Town's Parks and Recreation Commission, and they were

approved on August 20, 2025.

The third component was authorizing the Knights to place a nativity scene on the Town Hall Green. The Knights' position was that the nativity scene should be purchased with Town funds. The Town did not agree to this, and the Knights eventually proposed that even though they wanted the Town to pay, if the Town refused, the Knights would pay for it. On August 18, 2025, counsel for the Town followed up about the written redlined proposal he was expecting from the plaintiffs, but did not receive it. Then, during the September 23, 2025 status conference, based on his understanding that the Knights were willing to pay for the nativity scene on the Town Hall Green, Judge Vatti asked whether he and the parties were done with the settlement discussions if the Parks and Recreation Commission voted to approve the nativity scene with the Knights paying for it. Attorney Sargent represented that was so.

Thus, all of the terms of the agreement were agreed upon, and this factor suggests that the parties intended to be bound.

**4. Whether the Agreement at Issue is the Type of Contract that is Usually Committed to Writing**

There were three relatively simple components to the settlement discussions. While it was necessary to reduce to writing the agreed-upon revisions to the Town's regulations, so they could be approved by the Parks and Recreation Commission,

it was not necessary to reduce to writing the agreement by the Town's counsel to present the revisions to the Parks and Recreation Commission. In addition, while this was not the type of agreement where a writing was necessary because of the number of details or the complexity of the agreement, there are undoubtedly times when an agreement like the one at issue here is committed to writing. However, the court does not have an adequate basis for making a finding as to whether the type of agreement at issue here is or is not "usually committed to writing."

Thus, the court does not find this factor helpful in determining whether the parties intended to be bound.

**5. Guidance from the Factors**

After considering the fact that the plaintiffs' position relies principally on, at best, a subjective belief that there was not an agreement to settle the case, the fact that the first three Winston factors suggest that the parties agreed to be bound, and the fact that the fourth Winston factor does not suggest a contrary outcome, the court concludes that, based on all the facts and circumstances here, the parties intended to be bound and the settlement agreement should be enforced.

**B. The Omega Test**

The court starts its discussion with the second factor, i.e., the circumstances surrounding the transaction, including

the motives of the parties, because here the circumstances provide important context for the discussion of the first and third factors.

**1. Circumstances Surrounding the Transaction, Including the Motives of the Parties**

As discussed above, the context here is a series of settlement and status conferences presided over by Judge Vatti, during which the three components of the settlement discussions were being addressed sequentially. It is undisputed that the motive of the Town, which was shared by Judge Vatti, was to settle the entire case.

The plaintiffs attended each of the settlement or status conferences. It was clear that the case had been referred to Judge Vatti so he could preside over settlement proceedings to resolve the case, not so he could preside over conferences concerning ancillary matters that were not part of the settlement proceedings. While Attorney Sargent asserted that the amended regulations were not part of the settlement process, he did not proffer then, and does not proffer now, an explanation as to what purported process Judge Vatti, counsel for the Town and the plaintiffs were engaged in when they met to negotiate the amendments to the regulations. While it does appear that the motive of the plaintiffs at the beginning of the settlement process was to settle the entire case, the court

cannot discern what their motive was after the first couple of settlement conferences because they never explained to Judge Vatti or the Town what process they viewed themselves as being engaged in when they attended settlement conferences to discuss matters they maintain were not part of the settlement process.

The plaintiffs' conduct, however, suggests a pattern of moving the goalposts with respect to each of the three components of the settlement discussions. After agreeing to a figure of $95,000 for reimbursement of attorney's fees, which was substantially less than they wanted, the plaintiffs subsequently took the position that this component of the settlement was subject to further negotiation. After counsel for the Town began the process of presenting the proposed amended regulations to the Town, Attorney Sargent informed counsel for the Town that he would "revisit" not only the issue of attorney's fees but also the issue of the amended regulations. (See ECF No. 104-19 at 1 ("If we have a tentative agreement as to all the missing part, I will revisit the two other aspects.").) With respect to the nativity scene on the Town Hall Green, after the September 23, 2025 status conference, during which counsel for the Town reported that the Knights had filed an application stating that they would pay for the nativity scene on the Town Hall Green and that a vote by the Fairfield Parks and Recreation Commission was scheduled for

October 15, 2025, the Knights submitted an application on October 14, 2025 that changed the terms by requiring the Town to purchase the nativity scene.

In considering what is suggested by the plaintiffs' conduct, the court has taken into consideration a number of occasions on which Attorney Sargent has advanced baseless positions or arguments. For example, in an April 3, 2025 email, he asserted that he left a settlement conference that was held prior to April 2, 2025 with a clear understanding that there had been an agreement with respect to all three components of the settlement discussions with the exception of the language of the regulations. (See ECF 104-12.) But that was not how the settlement conferences progressed. Another example is the plaintiffs' assertion that the Town had rejected their July 14, 2025 proposal, when in fact the Town was waiting for a written redlined proposal from the plaintiffs, which they never provided. Other examples occurred during the April 10, 2026 hearing, where Attorney Sargent asserted that Judge Vatti never approved the amount of $95,000 for reimbursement of attorney's fees, that the negotiations with respect to the amended regulations were never final, and that the court should not rely on statements made by Judge Vatti during the October 24, 2025 status conference because he needed to be able to ask Judge Vatti questions and/or show him exhibits.

Based on the conduct engaged in by the plaintiffs and Attorney Sargent, the court can only conclude that they proceeded in bad faith.

Thus, the surrounding circumstances suggest there was an agreement to settle the case.

**2. Language Used**

The language used with respect to the first component of the settlement discussions, i.e., the reimbursement of attorney's fees, shows that there was an agreement reached between the parties and Judge Vatti with respect to reimbursement in the amount of $95,000. The plaintiffs contend that they reneged on that agreement but concede that they never raised that matter with Judge Vatti.

With respect to the second component of the settlement discussions, i.e., revisions to the Town's regulations, there is no particular language at issue. Rather, what matters is that on August 20, 2025, the Commission approved the amended regulations.

The language used at the September 23, 2025 status conference is a significant consideration with regard to the third component of the settlement discussions. The Town, supported by Judge Vatti's recollection, maintains that Judge Vatti asked Attorney Sargent whether the case would be settled, using the words "are we done?", if the Parks and Recreation

Commission approved the application that was filed on September 22, 2025, and that Attorney Sargent responded in the affirmative. The plaintiffs offer a different version of the exchange during the September 23, 2025 status conference. The version offered by the plaintiffs is not credible.

Therefore, the court concludes that the language used suggests there was an agreement to settle the case.

**3. Purposes Which the Parties Sought to Accomplish**

As discussed above with respect to the circumstances surrounding the settlement proceedings, the court concludes that two of the participants in the settlement discussions, namely the Town and Judge Vatti, sought to settle the case, but expresses no view as to precisely what the plaintiffs sought to accomplish.

However, in light of all the circumstances, the court concludes that this factor suggests there was an agreement to settle the case.

**4. Conclusion**

Looking at the parties' intent as determined from the language used, the surrounding circumstances, and the purposes the parties sought to accomplish, the court concludes that the parties here assented to settlement of the case on the following terms: The Town would pay the plaintiffs $95,000 as reimbursement for attorney's fees; the Town would adopt amended

regulations after they had been negotiated by the parties; and the Town would approve the September 22, 2025 application by the Knights to place a nativity scene on the Town Hall Green, with the Knights paying the costs.

**C. Attorney's Fees**

The Town includes in its motion a request for an award of its reasonable fees and costs incurred in preparing the instant motion. Neither side addressed the issue of attorney's fees in its memorandum, and they may be in a better position to address the issue of attorney's fees after reviewing this ruling. Accordingly, the Town shall file a supplemental motion for attorney's fees and costs within 21 days.

**IV. CONCLUSION**

For the reasons set forth above, the Town's Motion to Enforce Settlement Agreement (ECF No. 103) is hereby GRANTED.

The Town shall file a supplemental motion for attorney's fees and costs, including both the reasons it believes attorney's fees and costs should be awarded and the amount of attorney's fees and costs it is seeking (supported by documentation), within 21 days.

It is so ordered.

Dated this 30th day of September 2026, at Hartford, Connecticut.

/s/AWT
Alvin W. Thompson
United States District Judge